U.S. v. Cardiges                          CR-94-29-JD    01/26/95 P
                    UNITED STATES DISTRICT COURT FOR THE
                          DISTRICT OF NEW HAMPSHIRE

United States of America

        v.                              Criminal No. 94-29-03-JD

Stanley James Cardiges


                                O R D E R


        On Friday, March 11, 1994, the Grand Jury returned a six-
count indictment against several former employees of the American
Honda Motor Company, Inc.  The indictment named Stanley James
Cardiges in two counts, charging him with a violation of the
Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18
U.S.C. § 1962(c), and conspiracy to defraud American Honda,
certain Honda dealers, the United States, the United States
Treasury and the Internal Revenue Service in violation of 18
U.S.C. § 371.[1]  Cardiges has moved to suppress all evidence
obtained as a result of a search of his Laguna Hills, California,
home executed the same day the indictment was returned (documents
nos. 88 and 125).  The court held a suppression hearing on

_____

        [1]A superseding indictment was returned on October 27, 1994,
adding a charge of mail fraud in violation of 18 U.S.C. § 1341
and a charge of witness tampering in violation of 18 U.S.C. §
1512(b)(3).  A second superseding indictment was filed on January
19, 1995.

January 6, 1995.  For the following reasons, the defendant's motion is denied.

I.  Findings of Fact[2]

On March 11, 1994, FBI Agent William G. Tidyman coordinated the execution of a search warrant at the defendant's home. Because the house is large, Tidyman arranged for approximately ten agents to assist with the search.  Prior to execution, each agent was provided with a copy of the warrant and asked to read it, given background information on the case, and told the general contents of the affidavit Agent Tidyman had signed to procure the warrant.  The warrant authorized seizure of several types of documents as well as certain pieces of furniture and other items.  Agents were assigned to different rooms in the home to search for the various items described in the warrant.  Agent Tidyman did not participate in the search.  Rather, as the agents assigned to the different rooms seized various items determined to be within the scope of the warrant, they would place the items in a box, attach a list of contents and deliver the box to the location where Agent Tidyman was stationed.  Agent Tidyman would review the list with Mrs. Cardiges, explaining that the boxed

_____

[2]The court's findings of fact are made on the basis of all testimony and other evidence presented for its consideration.

2

items were being seized in compliance with the warrant. Agent Tidyman did not personally review the contents of the box, relying instead on the expertise of and the list provided by the other agents assisting with the search. In total, eleven boxes of documents were taken from the defendant's home along with certain items of personal property.

During the search, which lasted approximately three and one-half hours, two agents approached Agent Tidyman with a folder of documents. They questioned whether the folder should be seized because it was labeled in a manner indicating that it contained attorney-client communications. Agent Tidyman reviewed the contents of the folder for a period of less than thirty seconds and determined that the papers appeared to relate to car dealerships and, therefore, were within the scope of the warrant. However, because he was concerned the folder might contain privileged material, Agent Tidyman attempted to obtain advice from Stephen J. Katzman, an Assistant United States Attorney ("AUSA") assigned to the Santa Ana Branch of the Los Angeles United States Attorney's Office. When he was unable to reach AUSA Katzman, Agent Tidyman told the agents to seize the folder. The folder was listed on the inventory as "FILE FOLDER: ATTORNEY COMMUNICATIONS/PERSONAL NOTES: U.S. VS. CARDIGES."

In addition, certain documents retrieved during the search were beyond the scope of the warrant. For example, agents seized a brochure for an acting workshop, a booklet entitled "How to Make the Best Use of Your Compactronic 310 Electronic Typewriter," and photographs of the defendant and his wife with Jack Lemon and Guy Vander Jagt. However, Agent Tidyman testified that all of the non case-related documents had been seized because they were stored within a larger folder or file that also contained material the seizing agent determined to be within the scope of the warrant. This explanation was not contested and no contrary evidence was presented. Documents not related to the case were returned to the defendant as they were discovered by the government.

At the conclusion of the search, Agent Tidyman brought the eleven boxes to the Federal Bureau of Investigations ("FBI") office in Santa Ana, California, for storage. He then presented the folder labeled attorney communications/personal notes to AUSA Katzman for determination of whether it contained privileged material. Declaration of Stephen J. Katzman, ¶ 6. Agent Tidyman explained to AUSA Katzman his rationale for taking the folder, but had no further discussions with him about it.[3] AUSA Katzman

_____

[3] Agent Tidyman testified that he also had a conversation with a special agent assigned to the New Hampshire FBI office during which he informed the agent that the folder was found

4

conducted a cursory review of the folder but was unable to conclude definitively whether or not the material was privileged. Id. at ¶ 7.

On March 16, 1994, the defendant's attorney, Philip D. Israels, wrote to Agent Tidyman requesting that the file folder marked attorney-client documents be returned to the defendant. Affidavit of Philip D. Israels, ¶ 8. AUSA Katzman notified two AUSA's from the New Hampshire United States Attorney's Office involved in the case, offering to submit the documents to a magistrate judge for the Central District of California for a ruling. Declaration of Stephen J. Katzman at ¶ 8. The New Hampshire AUSAs advised him to return the documents to Attorney Israels. Id. The folder was hand delivered on March 25, 1994. Id. at ¶ 11.

The boxes containing the seized documents were sealed and sent by registered mail to the FBI in Concord, New Hampshire. On March 31, 1994, the morning of the defendant's arraignment, AUSA Michael Connolly, an AUSA for the District of New Hampshire and a

during the search, that he was concerned about its contents, and that it appeared to him that the contents contained documents regarding the ownership of car dealerships. Transcript of Hearing before the Hon. Joseph A. DiClerico, Jr., Cr. 94-29-03-JD (Jan. 6, 1995) ("Tr.") at 18-19.

Agent Tidyman never discussed the contents of the file with any member of the New Hampshire United States Attorney's Office except in preparation for the suppression hearing. Tr. at 19.

member of the prosecution team, invited the defendant and his attorneys, Attorney Israels and Attorney Rikki Klieman, to review the documents and retrieve any documents they believed to be privileged. The documents, under seal, were brought from a storage room to a large conference room. The defendant and his attorneys opened the sealed boxes for the first time since the documents had arrived in New Hampshire. Affidavit of Philip D. Israels, ¶ 11. They were supervised only by a government paralegal who remained in the room to maintain the integrity of the collection.

Between one and two hours after opening the sealed boxes, their review of the documents was interrupted when an AUSA not associated with the case informed them that he had previously reserved the conference room. AUSA Connolly returned and Attorney Klieman told him she had compiled certain documents containing privileged information. Attorney Klieman also informed AUSA Connolly that she had found documents she thought might be privileged but was not certain. AUSA Connolly told Attorney Klieman that he trusted counsels' judgment and instructed her and Attorney Israels to take any documents they considered privileged. No copies of the documents retrieved by the defendant were made by anyone. Those documents not taken by

6

the defendant were returned to storage and no further review was conducted.

Later that day, Cardiges was arraigned before Magistrate Judge William H. Barry. Following the arraignment, AUSA Connolly raised the issue of privileged documents with the Magistrate. The following colloquy occurred:

> Gov't: The government has not looked at the contents of any of those 11 boxes, but now we would like to, and we would like to do so without the risk of there being any claims down the road that we have breached Mr. Cardiges' attorney-client privilege. So I wanted to put that on the record, because from this point we intend to commence review of those materials and we'd like to know that we do so without some sort of peril to our case.

> Israels: Your Honor, may I be heard?

> Court: Surely.

> Israels: In fact, Mr. Connolly is correct; we were able to do some pretrial discovery today and look through those boxes. Obviously, we do not want to forfeit at this point any future motions that we might have to determine the taint in this matter in reference to those attorney-client privileged materials.

> Court: Then why don't you go back and take a second look at it, sir.

> Israels: Well, I --

> Court: I assume that you may also be moving to suppress. The fact that the government has seized these articles certainly doesn't affect one way or another that motion to suppress, but if there's motions concerning the attorney-client privilege maybe you ought to work those out before you leave.

7

Israels:  I think we have worked those out, your Honor, but there maybe motions in reference to the initial search that we don't know about at this point because we really haven't determined the taint.

\* \* \* \*

Court: . . . .  Well, if you, if you want, you certainly are afforded a second opportunity to go into the records and again to look at them to determine whether or not there are documents that may be covered by the attorney-client privilege. . . .

Israels:  We don't believe that there is any further material there.  If there is, my belief is Mr. Connolly will tell us about that if there's anything that obvious.  On the other hand, what we're just determining right now <u>is that if there was a taint up to this point we don't want to forfeit our right to make such a motion in the future</u>.

\* \* \* \*

Gov't:  For the record, your Honor, we'll give Ms. Klieman and Mr. Israels the rest of this week and next week if they wish to continue to go through as to remove any potentially attorney-client privileged material, but there must be a time that we can go through that without fear of risk of that tainting our case.

\* \* \* \*

Klieman: . . . .  I don't think we want to go through it again.  I think we've been through it as a cursory look. . . .  but, I do think the government proceeds at its peril <u>but we are telling the government at this point to go ahead</u>.  There's nothing else we can do.

<u>United States v. Cardiges</u>, Cr. 94-29-03-JD, Transcript of

Arraignment before the Honorable William H. Barry, Jr., (March

31, 1994) at 5-8 (emphasis added).  No further attempts were made

8

by the defendant to review the documents and remove privileged information.

Because the defendant did not take advantage of the opportunity to engage in a further review of the material and because the defendant would not affirmatively state that there were no additional privileged documents in the government's possession, the government contacted Stephanie Browne, an AUSA for the District of Rhode Island, and asked her to undertake an impartial review of the documents prior to their being reviewed by anyone associated with the prosecution. On April 20, 1994, AUSA Browne spent one day reviewing the documents. She examined every paper and found one folder that contained arguably privileged material. Erring on the side of caution, she removed the file, placed it in a manila envelope, sealed the envelope, typed a memo for record, and placed the memo and the sealed envelope in a second envelope to be sent to defense counsel. Tr. 88. Although AUSA Browne informed the New Hampshire United States Attorney's Office that she had located privileged information, she did not discuss the nature of the material she had found, removed and returned. Tr. 88-89.

Thereafter, the prosecution team began their review of the documents. They did not locate any material they believed to be privileged. However, they did find a set of handwritten notes

9

that are at least arguably privileged and have asked the court to determine the admissibility of these notes in a pending motion <u>in limine</u> (document no. 85).

II.  <u>Conclusions of Law</u>

On November 14, 1994, the defendant filed a "Motion to Suppress Illegally Seized, Privileged and Attorney Work Product Documents and Evidence Obtained Therefrom" ("Motion to Suppress") (document no. 88).  In this motion, the defendant argued that because attorney-client privileged information was seized from his home, "the Government conceivably has acquired additional evidence to be used against Cardiges and/or self incriminating statements."  Motion to Suppress at 5.  The defendant made a broad allegation that "many prosecutors involved in this case have had the opportunity to review privileged documents in the course of their continuing investigation, and the information contained therein certainly has led them to information which the Government may not have found without access to these documents." <u>Id.</u> at 6.  Therefore, the defendant argued that all attorney-client privileged information and the "fruits' derived therefrom should be suppressed under "`fruit of the poisonous tree' doctrine of the exclusionary rule."  <u>Id.</u> at 5; <u>see</u> <u>id.</u> at 6.

10

The suppression hearing was originally scheduled for December 13, 1994. The defendant raised the possibility of a conflict of interest between the court and one of the government's witnesses.[4] The hearing was postponed so that the issue could be resolved, but the court informed the defendant that his motion appeared deficient because he had not identified any privileged papers remaining in the government's possession. The court also informed the defendant that any claim that the search itself was unconstitutional had not been adequately raised in his motion to suppress.

On December 23, 1994, the defendant filed a reply to the government's response to his motion to suppress. Although entitled a reply brief, the document was in effect a second motion to suppress. This time, the defendant argued that every document seized from his home, and any documents obtained as a result of that seizure, should be suppressed because the seizing agents exceeded the scope of the valid search warrant and engaged in a generalized search. Reply Brief at 4-6.

The suppression hearing was held on January 6, 1995. At the hearing, the defendant focused his efforts on his contention that the agents had undertaken an unauthorized general search. At the

---

[4]The defendant subsequently waived objection to any possible conflict involving this witness and the court (document no. 126).

11

close of the hearing the court repeated its concern that, in the event the court did not exclude all evidence seized because the search was too broad, the defendant still had not identified any particular documents he was seeking to suppress, forcing the court to operate in a vacuum. In response, the defendant articulated a third suppression theory.[5] The defendant asserted that all handwritten notes seized should be suppressed because they are outside the scope of the warrant. The court will address the defendant's arguments in logical order.

A. General Search

The defendant argues that although the search warrant specified with particularity the items to be seized from his home, the agents exceeded the scope of the warrant and engaged in an unconstitutional general search. At the hearing, the defendant attempted to prove his argument by proffering a number of documents that clearly have nothing to do with his case.[6]

The Fourth Amendment prohibits general searches. See Maryland v. Garrison, 480 U.S. 79, 84 (1987); United States v.

---

[5]The court notes that the amoeba-like nature of the defendant's arguments has made it difficult for both the court and the government to respond to his motion.

[6]The defendant has filed the returned documents in camera with the court as defendant's Exhibit A.

12

Fuccillo, 808 F.2d 173, 175 (1st Cir.), cert. denied, 482 U.S. 905 (1987). Warrants must particularly describe the things to be seized. Stanford v. Texas, 379 U.S. 476, 485 (1965); Marron v. United States, 275 U.S. 192, 196 (1927) "When law enforcement officers grossly exceed the scope of a search warrant . . . , the particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of all evidence seized under that warrant." United States v. Medlin, 842 F.2d 1194, 1199 (10th Cir. 1988). However, "`[u]nlawful seizure of items outside a warrant does not alone render the whole search invalid and require suppression and return of all documents seized, including those lawfully taken pursuant to the warrant.'" United States v. Young, 877 F.2d 1099, 1105 (1st Cir. 1989) (quoting Marvin v. United States, 732 F.2d 669, 674 (8th Cir. 1984)) (alternation in original). The court is only required to suppress all evidence in those unusual cases where "the lawful and unlawful parts of the search were inextricably intertwined, or where the lawful part seems to have been a kind of pretext for the unlawful part." Id. (citing Medlin, 842 F.2d at 1198-99 (10th Cir. 1988); United States v. Retting, 589 F.2d 418, 423 (9th Cir. 1978)). As the Medlin court noted, suppression of all evidence is only appropriate in cases

13

where there has been "flagrant disregard" of the warrant. Medlin, 842 F.2d at 1199.[7]

The defendant does not argue that the warrant was unlawful either because it was obtained through improper procedures or because there was an insufficient showing of probable cause. Nor does the defendant argue that the warrant did not describe the items to be seized with particularity. Therefore, the court begins with the presumption that the warrant was initially valid and considers only whether the actions of the seizing agents require suppression of all evidence seized.[8]

There is no evidence before the court suggesting that the execution of the warrant was pretextual or that the lawful and unlawful parts of the seizure are "inextricably intertwined." Indeed, the nature of the "unlawful documents" seized is indicative of the lack of pretext on the part of the agents. Under the circumstances of this case, there is certainly no reasonable basis to justify the conclusion that this lawful

---

[7]The defendant relies on Medlin as primary support for his suppression argument.

[8]The defendant has repeatedly pointed the court to Coolidge v. New Hampshire, 403 U.S. 443 (1971), as support of his argument. Coolidge is inapposite. In Coolidge, the Supreme Court found that the seizure and subsequent search of the petitioner's car was invalid because the warrant was not issued by a "neutral and detached magistrate." 403 U.S. at 449. Subsequent analysis focused upon whether there was an exception to the warrant requirement. See generally, id.

warrant was obtained because the government was in fact seeking to gain possession of pictures of the defendant with Guy Vander Jagt, the defendant's acting workshop brochures, or the instruction manual to the defendant's typewriter. The government's actions in locating and returning documents outside the scope of the warrant provide additional support for the court's finding that the lawful part of the search was not merely pretextual. Likewise, there is no evidence that the "unlawful parts" of the search are not extricable from the "lawful parts." In fact, the "unlawful parts" have been extricated and returned to the defendant. Therefore, the court rejects the defendant's contention that a general search of his house took place requiring suppression of all evidence seized.

B. Handwritten Notes

The court will next address the defendant's contention that certain handwritten notes were outside the scope of the warrant and therefore were unlawfully seized.[9]

---

[9]At the suppression hearing, the defendant asked the court to suppressed all handwritten notes seized. The only notes identified by the defendant, however, are those currently the subject of the pending motion in limine. Therefore, these are the only notes the court will consider in context of the defendant's Fourth Amendment argument. The court simply cannot determine whether notes it has never seen and does not know exist fall within or without the scope of the warrant.

As the court has previously noted, it is well settled that the Fourth Amendment requires that a search warrant describe with particularity items to be seized.  Stanford, 379 U.S. at 485; United States v. Abrams, 615 F.2d 541, 543 (1st Cir. 1980).  When an official search is properly authorized by the issuance of a valid warrant, the scope of the search is limited by the terms of its authorization.  Walter v. United States, 447 U.S. 649, 656 (1980).  An officer executing a search warrant may only take that which is authorized pursuant to the warrant.  Marron, 275 U.S. at 196.  However, "[e]vidence not described in a valid search warrant but having a nexus with the crime under investigation may be seized at the same time the described evidence is seized." United States v. Kane, 450 F.2d 77, 85 (5th Cir. 1971), cert. denied, 405 U.S. 920 (1972) and cert. denied, 405 U.S. 934 (1972).

The First Circuit has recognized that "seizing business records in a fraud investigation presents special problems" and that "[e]specially difficult is the case where the files contain a mixture of `bad' material (supported by probable cause) and `innocent' material." United States v. Diaz, 841 F.2d 1, 6 (1st Cir. 1988).  Warrants of this nature are often acceptably broad by necessity and even well-trained agents may need to defer to the greater legal knowledge of the magistrate to know where to

16

"draw the line." Id. These agents are entitled to rely on the warrant and to seize files that contain the material specified. See id. at 4-6.

The search warrant for the defendant's home described the following property to be seized:

> Black leather-bound notebook, checks and check registers and stubs, bank statements, records of money orders and wire transfers, loan applications, financial statements, promissory notes to Don Carlton and Cliff Peck, corporate books and records of WORLDWIDE DYVE, INC. and J. CAR CONSULTANTS AND DEVELOPMENT, records reflecting transactions involving real estate, real estate loans and expenses and income attributable to real estate, tax returns and supporting documentation, records reflecting ownership in automobile dealerships and corporations owned and controlled by Stanley James Cardiges, automobile titles, receipts for home furnishings and personalty (including furniture, paintings jewelry, oriental rugs, vases, draperies, lighting fixtures, piano and a laser Kareoke machine), documents identifying leased warehouse and or office space, documents reflecting importation of merchandise and U.S. Customs entry documents,

and a significant list of home furnishings. Motion to Suppress, Attachment B.

The court agrees with the defendant that the handwritten notes in question are not described in the warrant.[10] However, there is absolutely no evidence to support the defendant's contention that the documents were illegally seized. The only evidence introduced relevant to this issue is the testimony of

_____

[10]Because these notes are currently under seal, the court will not relate their contents.

17

Agent Tidyman. Agent Tidyman testified that any individual document seized that was not pertinent to the case was part of a larger folder or file which contained documents specified in the warrant and/or documents with an apparent relevant nexus to the case. The defendant made no attempt to rebut this testimony either on cross-examination or by calling any of the agents responsible for the seizure to testify. The court accepts Agent Tidyman's explanation, which it finds credible, and finds that only folders and files containing information specifically included in the warrant or having a nexus with the crime were seized and that the handwritten notes were found in one such folder or file. The agents who seized the folder containing the notes were entitled to rely on the warrant. Therefore, suppression of the document is not required by the Fourth Amendment.

### C.  Attorney-Client Privileged Documents[11]

Finally, the court turns to the defendant's initial contention that the court should suppress the attorney-client privileged documents and their "fruits."

---

[11]Once again, the court notes that the admissibility of the handwritten notes is the subject of a pending motion in limine. Whether or not these notes may be excluded on the basis of attorney-client privilege will be considered in a separate order. Thus, the notes are not considered in this section of the court's order.

The court cannot determine whether there was a violation of the defendant's attorney-client privilege until it determines whether the government actually procured or is in possession of privileged information.  See United States v. White, 879 F.2d 1509, 1513-14 (7th Cir. 1989).  The burden is on the defendant to identify the documents he seeks to suppress.  United States v. Bay State Ambulance and Hosp. Rental Serv., 874 F.2d 20, 28 (1st Cir. 1989) ("The burden of proving the existence of the privilege is on the party asserting the privilege.").  The court on several occasions has reminded the defendant of his burden.  Nonetheless, he has not come forward with a single document he claims the government wrongfully possesses other than the handwritten notes previously discussed.[12]

---

[12]In his original motion, the defendant argued that a manilla folder of attorney-client privileged papers separated by Attorney Klieman was misplaced by the United States Attorney's Office, mixed among the other documents and reviewed by the government during the course of the investigation.  Motion to Suppress at 5-6.  According to that motion, and an affidavit filed in support and signed by Attorney Israels, these documents were dispersed among the other documents seized, thereby tainting all the documents and making every later obtained document fruit of the poisonous tree.  However, at the suppression hearing, the defendant withdrew his contention that suppression was warranted because the government allowed privileged information to become integrated into the remaining documents and improperly reviewed by prosecutors. See Tr. at 83-85.  During closing arguments, Attorney Israels stated that he no longer wished to pursue the issue because, contrary to his affidavit, he was no longer able to state with certainty that he did in fact return a folder of documents to the government.  Tr. at 105-106.

19

The defendant attempts to circumvent his responsibility by arguing that there were "tens of thousands of documents" and it would have been unduly burdensome for him to review the seized material to determine whether boxes contained any privileged information. Tr. at 108-109. However, at the hearing, AUSA Browne testified that it took her a single day to review all eleven cartons of seized documents and remove the privileged information. When provided with a reasonable opportunity to do so, it was the defendant's responsibility to take the time to review the documents, not only to prepare for this motion, but also to protect his rights.

The defendant presents no reasonable excuse for his failure to take advantage of the opportunities provided by the government to review the material and to retrieve any privileged documents prior to the government's inspection of them. Therefore, the court finds that the defendant's conduct constitutes a waiver of the attorney client privilege. See Kevlik v. Goldstein, 724 F.2d 844, 849 (1st Cir. 1984) (presence of a third party destroys privilege where parties intentionally allow third party to invade privilege); see also Guy v. United Healthcare Corp., 154 F.R.D. 172, 179 (S.D. Ohio 1993) ("The voluntary disclosure of privileged material to third parties waives the attorney-client privilege."). The court is sympathetic to the defendant's

contention that criminal defendants should not have to assume in all circumstances that authorities improperly seized materials. However, in this case, the defendant was on notice that the seized materials might include privileged information.

Several days following the search of his home, the defendant requested a file marked attorney-client documents. Shortly thereafter, these documents were returned to him.[13] Less than one week later, the United States Attorney's Office offered the defendant an opportunity to review the remaining documents prior to any member of the prosecution team doing so. Although his review was interrupted, the defendant and his attorneys were able to identify further attorney-client privileged material.

That same day, the defendant stated before a United States Magistrate that he was unwilling to concede that the documents in the government's possession were free of privileged documents. Nonetheless, the defendant informed the magistrate that although he wanted to preserved any objection based on taint that may have

---

[13] In his original motion, the defendant asserted that he did not retrieve the folder listed on the inventory as containing attorney communications/personal notes until he and his attorneys reviewed all the documents in New Hampshire prior to his arraignment. Israels Affidavit, ¶ 11. This assertion does not comport with the great weight of evidence before the court. See Katzman Declaration, ¶ 11; Katzman Letter to Israels; Tidyman Testimony, Tr. at 17. Accordingly, the court has found that the return of this folder occurred as outlined under the "findings of fact" section supra.

occurred up to that point, (i.e., the time of the arraignment), he did not intend to conduct a further review and explicitly invited the government to examine the documents its possession.

In response, the government, in the exercise of commendable caution and with due respect for the defendant's claimed privilege, again offered the defendant an opportunity to review the documents. When he did not do so, the government once again went the extra mile and contacted AUSA Browne, someone who was neither a member of the prosecution team nor a member of the New Hampshire United States Attorney's Office, to undertake an impartial assessment. AUSA Browne located more arguably privileged material which was returned to the defendant, once again putting him on notice that the collection was not pristine after he completed his review on the day of the arraignment.

If the prosecution team has had access to any privileged documents, and the court is not inclined to believe they have, then it is a direct consequence of the defendant's inaction. If the defendant was concerned that the time allotted by the government to undertake a satisfactory review was insufficient, he could have requested the court to keep the documents sealed until such time as he had completed his review. Instead, he stated at the time of his arraignment that he was only concerned

about _prior_ improper disclosure to the government and invited the prosecution team to review the documents.[14]

Moreover, if the defendant believed that the government should not be allowed to examine the documents after AUSA Browne's inspection turned up more arguably privileged documents[15], he could have contacted the United States Attorney's Office for permission to review the documents before the government went ahead or, again, requested the court to keep the documents sealed to permit him and his counsel an opportunity to cull out any remaining privileged information. The defendant did neither. Apparently the defendant decided to ignore any renewed concern that the AUSA Browne's review was not partial or that some privileged documents might remain in the prosecutors' possession.

The defendant's statement to the magistrate that he was only concerned about prior taint, his invitation to the prosecutor to review the documents, and his apparent passivity in not undertaking a further review of the documents constituted a

_____

[14]Based on the evidence before it, as outlined _supra_, it is clear that there was no taint prior to the defendant's arraignment.

[15]At the hearing, the defendant intimated that AUSA Browne was closely associated with the New Hampshire United States Attorney's Office and therefore and improper person to conduct an impartial review of the documents.

23

waiver to any objection he may have had to the government's reviewing the files in its possession. See In re Grand Jury Proceedings, 727 F.2d 1352, 1356 (4th Cir. 1984) (documents lose privileged status if disclosing party does not take reasonable steps to insure and maintain confidentiality); FDIC v. Marine Midland Realty Credit Corp., 138 F.R.D. 479, 481-84 (E.D. Va. 1991) (same, citing cases). The defendant has established no reasonable basis on which the court can reward his inertia by suppressing all evidence seized. The defendant has failed to satisfy his burden of coming forward with evidence that the government has attorney-client privileged documents that should be suppressed. In addition, the defendant has waived his privilege with respect to any information prosecutors may have examined after he had ample opportunity to prevent that examination. Finally, the defendant invited the prosecution team to go forward with their review. Accordingly, the court denies the defendant's motion to suppress attorney-client privileged documents.

## Conclusion

The defendants' motion to suppress (document no. 88) is denied.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

January 25, 1995

24

cc:  Michael J. Connolly, Esquire
David W. Long, Esquire
Kevin E. Sharkey, Esquire
Stephen Lyons, Esquire
Paul J. Twomey, Esquire
Gregory W. Swope, Esquire
Philip Israels, Esquire