UNITED STATES of America, Plaintiff,

v.

Herbert DERMAN, Defendant.

Criminal Action No. 95–30028–MAP.

United States District Court,
D. Massachusetts.

July 23, 1998.

Ariane D. Vuono, United States Attorney's Office, Springfield, MA, for U.S. Attorneys.

Paul A. Goldberger, New York, NY, John P. Pucci, Fierst & Pucci, Northampton, MA, for Herbert Derman, Defendant.

*MEMORANDUM REGARDING DEFENDANT'S MOTION TO SUPPRESS AND MOTION TO DISMISS COUNT FIVE* (Docket Nos. 213 & 365)

PONSOR, District Judge.

## I. INTRODUCTION

Defendant, Herbert Derman ("Derman"), faces charges of Conspiracy to Manufacture and Possess with Intent to Distribute Marijuana, 21 U.S.C. § 846; Manufacture and Possession with Intent to Distribute Marijuana, 21 U.S.C. § 841(a)(1); Conspiracy to Commit Money Laundering, 18 U.S.C. § 1956(a)(1)(A)(i); Money Laundering, and Criminal Forfeiture, 21 U.S.C. § 853.

Derman has moved to suppress the fruits of December 1995 searches of four properties: his New York City apartment ("apartment"), his New York City law office ("law office"), his North Egremont, Massachusetts weekend home ("Egremont property") and his Vail, Colorado vacation home ("Colorado property"). Derman has also moved to dismiss Count Five of the indictment, the conspiracy to commit money laundering count, on the ground that the facts, as set forth in the indictment, fail to allege criminal activity within the applicable limitations period.

For the reasons set forth below, the court will deny Derman's motions. With respect to the Motion to Suppress, the court finds that the affidavit of Agent John Leahy of the Internal Revenue Service ("Agent Leahy") accompanying the four December 1995 warrant applications contained adequate contemporaneous information to support the existence of probable cause to search Derman's four properties. Furthermore, the warrant

authorizing the search of Derman's law office was sufficiently particular to pass constitutional muster, and the agents, in executing the warrant, did not impermissibly exceed its scope. Finally, the court will also deny Derman's Motion to Dismiss Count Five because the facts alleged in the indictment describe criminal activity within the five-year limitations period.[1]

## II. FACTUAL BACKGROUND

Some time prior to August 1995, the Government commenced an investigation of what it suspected was a large-scale marijuana grow operation in western Massachusetts. Various agencies of the federal government were involved with the investigation, including the Internal Revenue Service ("IRS"), the Drug Enforcement Administration ("DEA"), and the Massachusetts State Police. According to the Government's informants, the marijuana grow operation began in the 1980s and continued through the mid-1990s, and was masterminded by one Marcel Rosenzweig ("Rosenzweig") and Derman.

On August 16, 1995, and August 25, 1995, federal agents searched Rosenzweig's property located at 40 Clark Road, Sandisfield, Massachusetts ("the Sandisfield property"). The search of the Sandisfield property resulted in the seizure of over 5,500 live marijuana plants with an estimated street value of $8 million, as well as $800,000 in cash, gold bars, sophisticated hydroponic growing equipment and firearms. Further, four polaroid photos were found, two depicting an aboveground greenhouse and the others showing what looked like an underground greenhouse facility. During these searches, Rosenzweig and a worker, Edward Brennan ("Brennan"), were arrested on drug charges, and were later indicted. Derman, however, was not charged at this time.[2]

---

1. In a portion of his original Motion to Dismiss, Derman refers to Count One. However, the parties agree that the count at issue is the Conspiracy to Commit Money Laundering count, or Count Five of the October 10, 1996 Superseding Indictment. For consistency, the court will refer to Count Five.

2. A motion to suppress the fruits of the August 1995 searches in Sandisfield, Massachusetts, filed by Derman's co-defendants, has been denied. All these co-defendants have now pled guilty.

From August to December 1995, Agent Leahy interviewed eight independent informants. Many of the informants named Derman as one of the principals of the marijuana grow operation, and each detailed different aspects of the operation, including: the relationships among the principals, details of the marijuana grow operation, the current location of the marijuana grow on Rosenzweig's property in Sandisfield, Massachusetts, and its former location in an underground greenhouse on Derman's property in North Egremont, Massachusetts.

On November 3, 1995, federal agents searched the greenhouse area located on Derman's Egremont property. During this search, the agents discovered an immense concealed underground grow area below the greenhouse. No marijuana plants or cultivation materials were found during this November 3, 1995 search. However, a forensic chemist subsequently examined samples of materials taken during the search, and concluded that marijuana had, at one time, been grown in the underground space.

At the time of the November 3, 1995 search, Agent Leahy interviewed Derman at his North Egremont, Massachusetts residence. On December 20 and 21, 1995, Government agents obtained warrants and conducted searches of the four Derman properties.

At the heart of Derman's Motion to Suppress lies the affidavit of IRS Agent John Leahy, upon which the December 1995 search warrants were based. The Leahy affidavit provided an extensive review of the Government's investigation up to that time. The affidavit described the August 1995 searches of Rosenzweig's Sandisfield, Massachusetts property and the items seized during this search, the November 3, 1995 search of Derman's North Egremont, Massachusetts property and the November 3, 1995 interview of Derman himself.

The affidavit noted that during the November 3, 1995 interview Derman denied any involvement in a marijuana grow operation and stated that his involvement with Rosenzweig was limited to three minimal legal matters over two decades: establishing a corporation in the 1970s, Barene Realty, Inc.; representing Rosenzweig during his divorce, and representing Derman in a minor civil matter. Further, Derman stated that he had never lent money to, or borrowed money from, Rosenzweig and *never* acted as Rosenzweig's agent in any financial transaction. Derman also stated that he had rented the greenhouse on his Egremont property to one Richard Haber ("Haber"), but denied that Haber had any involvement in building the underground greenhouse.

Agent Leahy outlined in the affidavit several inconsistencies in Derman's statements during the November 3, 1995 interview. First, prior to the interview, Agent Leahy had discovered, during a review of Derman's bank statements, that canceled checks from Barene Realty, Inc. had been sent to Derman's New York City law firm as late as 1992. Despite this, Derman suggested during his interview that his only involvement with Barene Realty, Inc. was in its formation in the 1970s. Second, in reviewing Derman's bank records, Agent Leahy had found a canceled check for $22,000 to Condor Inc., drawn on Derman's escrow account for the purchase of a vehicle known to be registered to Rosenzweig. This information directly contradicted Derman's statement that he had never performed financial transactions for Rosenzweig. When confronted with the existence of the canceled check, Derman eventually admitted that he had received the $22,000 in cash from Rosenzweig, but stated that he could not recall whether he had deposited the money. Third, subsequent to Agent Leahy's November 3, 1995 interview with Derman, Agent Houle of the DEA interviewed one Roy Wilkenson ("Wilkenson"). Wilkenson stated that Derman had introduced him to Haber and, subsequently, at Haber's request, Wilkenson had built the underground structure. This contradicted Derman's statement that Haber had nothing to do with building the underground greenhouse.

Included in the December 1995 affidavit were detailed synopses of the statements made by the eight independent informants. These descriptions tended to confirm each other in many respects, with the result that a detailed and cohesive picture of the alleged

conspiracy, with Derman among those at the center, emerged from the affidavit.

Annexed to the four warrant applications was an extensive list entitled "Items to be Seized," along with the indictments of Rosenzweig and Brennan, the 1994 canceled check payable to Condor, Inc. drawn on Derman's escrow account, and a document titled "Privilege Team Instructions." The "Privilege Team Instructions" required the agents and investigators to limit their search to those items listed in the "Items to be Searched" list.

Eventually, on December 20 and 21, 1995, three Magistrate Judges issued warrants for Derman's four known properties: his New York City apartment and law office, his Egremont property, and his Colorado property.[3] The search of Derman's North Egremont, Massachusetts and Colorado properties occurred without incident.

Derman claims, however, through the affidavit of his secretary, Aghavni Ellian ("Ellian"), that despite the "Privilege Team Instructions" the agents were indiscriminate in searching potentially privileged material at his law office. Specifically, Derman claims that the agents failed to show Ellian the warrant upon her request, searched files without limitation, made notes on material found in the files, took files to agents in a separate room, and listened to dictation tapes. It is uncontested that, during the search of Derman's law office, the Government seized two unrelated files that were later returned, *Halliday v. Halliday* and *Hertz v. Derman*.

Derman also asserts that the Government improperly seized privileged material during the search of his New York apartment. Through the affidavit of his wife, Barbara Derman, he contends that one file seized at the apartment, *Derman v. Doe*, was found upon later inspection to be missing certain medical records. A subsequent inspection of the file, however, revealed that the missing medical records were returned and marked "possibly privileged."

On the face of Barbara Derman's affidavit, the court finds nothing impermissible in the Government's method or manner of conducting the apartment search. This aspect of defendant's motion need not be addressed further.

On April 9, 1996, Derman was charged in a superseding indictment along with Rosenzweig, Brennan, Haber and others, with, *inter alia*, Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 371. On October 1, 1996, the Grand Jury issued a second superseding indictment that included the money laundering charge as Count Five. This count alleges that Derman and the other co-conspirators performed numerous financial transactions involving the proceeds from "some form of unlawful activity" (1) with the intent to promote the unlawful activity, and (2) knowing that the transaction was designed at least in part to conceal the illegal activity.

Count Five lists twenty-two overt acts committed by the co-conspirators between November 9, 1983 and April 28, 1995. For instance, the indictment avers that on January 9, 1992, Derman issued a check in furtherance of the conspiracy in the name of Barene Realty, Inc., payable to Huntington Power Equipment, and on May 10, 1994 Derman transferred $22,000 from Derman's escrow account to Condor, Inc. on Rosenzweig's behalf.

### III. DERMAN'S SUPPRESSION ARGUMENTS

In support of his motion to suppress, Derman makes three arguments. First, he challenges the probable cause determination underlying all four warrants by asserting that the information was unreliable and stale. Second, he contends that the warrant itself lacked sufficient particularity. Finally, he argues that the agents, in executing the search warrant of his law office, employed a method that was over-broad and violated at-

---

3. Magistrate Judge Barbara A. Lee from the Southern District of New York issued the two New York search warrants; Magistrate Judge James Robb from the District of Colorado issued the Vail, Colorado warrant, and Magistrate Judge Kenneth P. Neiman issued the North Egremont, Massachusetts warrant.

torney client privilege. The court will address each argument separately.

### A. Unreliability and Staleness of Agent Leahy's Affidavit

According to the defendant, the *only* conduct in Agent Leahy's affidavit attributable to Derman after 1991 occurred in May 1994 when Derman gave Rosenzweig a check for $22,000.00 drawn on his law firm's escrow account, some nineteen months prior to the December 20 and 21, 1995 warrant applications. This, the defendant says, is not enough to justify the search.

In assessing the adequacy of an affidavit to support a warrant, the court must examine the "totality of the circumstances." *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). To justify a finding of probable cause, the facts alleged must not only be sufficient, they must also be close enough in time to support the issuance of the warrant at the time requested. *Sgro v. United States,* 287 U.S. 206, 210, 53 S.Ct. 138, 77 L.Ed. 260 (1932).

In *United States v. Bucuvalas,* 970 F.2d 937, 940 (1st Cir.1992), *cert. denied,* 507 U.S. 959, 113 S.Ct. 1382, 122 L.Ed.2d 758 (1993), the Court of Appeals considered whether events that occurred before 1983 were sufficiently contemporaneous to support a 1987 search warrant application. *Id.* at 940–41. In holding that the asserted facts were not stale, the First Circuit concluded that "[s]taleness does not undermine the probable cause determination if the affidavit contains information that updates, substantiates, or corroborates the stale material." *Id.* at 940 (citations omitted).

Similarly, in *United States v. Procopio,* 88 F.3d 21, 26 (1st Cir.), *cert. denied sub nom., Lattanzio v. United States,* — U.S. —, 117 S.Ct. 620, 136 L.Ed.2d 543 (1996), the defendant argued that the information supporting the warrant was stale because it was

fourteen months old at the time of the application. *Id.* The Court of Appeals again rejected this argument, noting that "the fact that the robbery had taken place many months in the past did not eliminate the likelihood that the paper trail of financial records could be found in [the defendant's] residence." *Id.*

In *Procopio,* as here, the defendants were charged with money laundering. Thus, even if the last transaction of the conspiracy occurred with the May 1994 check, a "paper trail" of evidence of the conspiracy was likely to be found in one of Derman's four properties in December 1995.

Moreover, the information Agent Leahy discovered in his November 3, 1995 interview with Derman provides a corroborating update to the earlier information. On November 3, 1995, when first questioned about the $22,000.00 check, Derman denied any knowledge that the transaction was related to Rosenzweig. When Agent Leahy produced evidence concerning the check, however, Derman admitted that it came from his client account. During the same interview, Agent Leahy asked Derman about Barene Realty, Inc. Derman stated that his only involvement was to establish the corporation for Rosenzweig in the 1970s. However, canceled checks were sent to Derman's law firm as late as 1992. These inconsistencies serve to update and corroborate the statements made by several informants concerning Derman's alleged ongoing involvement in the marijuana grow operation. In sum, both the nature of the crime and the corroborating evidence supported issuance of the warrants.[4]

### B. The Particularity Requirement

The Fourth Amendment to the United States Constitution requires a particular description of things to be seized. However, as with the question of staleness, this require-

---

4. *United States v. Dethlefs,* 883 F.Supp. 766 (D.Me.1995), cited by the defendant to support his staleness argument, is inapposite. In *Dethlefs,* the underlying crime was a long-term drug conspiracy. The court held that the information in the supporting affidavits, though lengthy, was stale because it related to acts several years prior

to the issuance of the warrant. *Id.* Nothing in that application updated the stale data. Notably, the court held that, where otherwise stale information is accompanied by more recent corroborating evidence of the continuation of the crime, a determination that probable cause exists is justified. *Id.* at 772–73.

ment is balanced by considerations of reasonableness. *United States v. Fuccillo,* 808 F.2d 173, 176 (1st Cir.), *cert. denied,* 482 U.S. 905, 107 S.Ct. 2481, 96 L.Ed.2d 374 (1987). To assist trial courts in making this balance, the First Circuit has set forth a two-part test. The court must examine

> ... first, the degree to which the evidence presented to the magistrate establishes reason to believe that a large collection of similar contraband is present on the premises to be searched, and, second, the extent to which, in view of the possibilities, the warrant distinguishes, or provides the executing agents with criteria for distinguishing, the contraband from the rest of an individual's possessions.

*Id.*

Derman argues that, even if probable cause existed to support the search of his law office, the warrant lacked sufficient particularity under the Fourth Amendment, especially in view of the likelihood that privileged documents would be encountered in the law office. Specifically, Derman challenges paragraphs 5, 6, 9 and 11 in the "Items to be Seized" document annexed to the warrant application.

These paragraphs are as follows:

5.  All unprivileged documents in client files relating to Marcel Rosenzweig a/k/a/ Marcel Greenbaum, Richard Haber, Harold Collins, Barene Realty and Groteck.

6.  All document related to any transaction between Herbert Derman, Barbara Derman, Marcel Rosenzweig a/k/a/ Marcel Greenbaum, Richard Haber, Harold Collins and other co-conspirators identified in the attached affidavit including canceled checks, cashier's checks, money orders, invoices, contracts, agreements, correspondence and memoranda.

9.  Letters and other documents reflecting communications between Herbert Derman, Barbara Derman, Marcel Rosenzweig a/k/a/ Marcel Greenbaum, Rich-

ard Haber, Harold Collins and their criminal associates identified in the attached affidavit.

11. Address and phone books reflecting the names and addresses of associates identified in the attached affidavit.

Derman argues that the warrant was "conclusively invalidated" by its failure to specify the distinguishing characteristics of the items to be seized. Further, he contends that the warrant did not provide the agents with the information necessary to distinguish proper objects of the warrant from other untargeted, privileged documents that were part of his law practice.

The Government responds that, given the broad nature of the crimes alleged—money laundering and drug conspiracy—the warrant language reasonably specifies the documents to be seized. In addition, according to the Government, the particularity requirement was met through the "Privilege Team Instructions" to the agents performing the search.

As a threshold matter, the warrant application clearly satisfies the first prong of the *Fucillo* test: evidence of the long-term marijuana grow operation and money laundering scheme was likely to be found on one or more of Derman's four properties. *Fucillo,* 808 F.2d at 176. The Leahy affidavit established probable cause to believe that Derman performed financial transactions with the proceeds of the conspiracy and, at one time, provided space for the marijuana grow. Evidence of either the alleged illegal financial transactions or the marijuana grow operation might reasonably be expected to be found at Derman's law office. Thus, the language "[a]ll documents related to any transaction between Herbert Derman, Barbara Derman, Marcel Rosenzweig a/k/a/ Marcel Greenbaum, Richard Haber, Harold Collins [a Rosenzweig alias] and other co-conspirators identified in the attached affidavit including canceled checks, cashier's checks, money orders, invoices, contracts, agreements, correspondence and memoranda" is sufficiently particular to pass constitutional scrutiny, given the nature of the crimes.[5]

---

5.  Arguably broader language was held to pass constitutional muster in *Dethlefs,* 883 F.Supp. at 770.

■ Under the second prong of the *Fuccillo* test, the warrant application also provided the executing agents with criteria to distinguish items to be seized from those that are privileged. *Id.* at 176. Here, the challenged paragraphs of the "Items to be Seized" list must be analyzed in conjunction with the "Privilege Team Instructions." The document, "Items to be Seized" sets forth the category of documents subject to seizure: that is, any unprivileged material relating to the alleged conspiracy as described in Agent Leahy's affidavit. To protect possibly privileged material the Government established a "Privilege Team." This team was separate from the searching agents and made on-the-spot determinations concerning whether a particular item was privileged.

Derman concedes that the language of paragraph five, as quoted above, was adequate to protect privileged information, but argues that the subsequent paragraphs rendered it meaningless by removing the privilege limitation and by failing to specify *where* the agents were to look for the information.

This argument takes the particularity requirement too literally. Under defendant's suggested analysis, the warrant fails because, in essence, it did not describe in which file cabinet or drawer the items would be located. Few warrants could pass this test. The Fourth Amendment's particularity requirement is more fluid, the test being whether the warrant is "sufficiently definite so that the officer executing it can identify the property sought with reasonable certainty." 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 4.6(a) at 551 (3d ed.1996) (citation omitted). The "Items to be Seized" list in connection with the "Privilege Team Instructions" provide this security, given the practical demands of a search in this environment for the sorts of material the warrant specified.

### C. The Scope of the Warrant

In support of his argument that the search itself was conducted too broadly, Derman points to several facts. First, he points out that the Government's "Privilege Team Instructions" state that "only client files relating to Marcel Rosenzweig, Richard Haber and Barene Realty may be searched and seized." As noted, according to Derman's secretary, the agents searched randomly through files of the targeted individuals, as well as through files unrelated to the targets, and listened to Dictaphone tapes when there was nothing to link them to one of the targets.[6]

Second, Derman points to two files that were eventually returned as "possibly privileged": *Halliday* divorce files and a file labeled *Hertz v. Derman* concerning an unrelated civil matter. He asserts that the return of these files evidences the Government's disregard for privileged information as well as its "pretextual" motives. Third, Derman asserts that the seizure of message books and lawyers' diaries was manifestly outside the scope of the warrant.

In his first argument, Derman points to the Government's perusal of files, documents and tapes lacking the targeted individuals' names as evidence of the over-breadth and the pretextual nature of the Government's search. Derman is correct in that the Government's instructions to the search team, annexed as part of the warrant application, suggests that only files with the names of the targeted individuals should be *searched.* Derman's position, however, that only those files specifically labeled with the targets' names could even be opened, belies common sense.

In a case not cited by either party, but factually similar to this case, *United States v. Abbell,* 963 F.Supp. 1178 (S.D.Fla.1997), the Government employed a team of Justice Department attorneys to accompany the search team during the search of the defendant's law office, and make on-the-spot determinations concerning possibly privileged material. *Id.* at 1183. Although the agents seized computer discs not bearing the name of the targeted individual, the court concluded that the search did not violate the Fourth Amendment because the tapes might have *contained information* regarding the targeted

---

**6.** The Government contests these assertions, at least in part, but the court accepts them for purposes of this motion. Thus, no evidentiary hearing is necessary.

individual. *Id.* at 1201. In reaching this conclusion, the court held that, "[w]hen executing a search warrant for documents, searching agents are entitled to at least cursorily examine each document at the specified search location." *Id.* at 1198. This flexibility is necessary in a case involving "a number of items of evidence that may not appear incriminating in a vacuum but may have an interlocking character that constitutes evidence of a crime." *Id.* at 1197–98.

In this case, the Government's methods were similar to the procedures approved in *Abbell.* The Government provided the searching agents access to a team of Government experts with whom they could consult concerning possibly privileged material. As in *Abbell,* it was necessary for the agents to look briefly through all the files and listen to the tapes, to insure they contained no targeted material. The agents certainly acted reasonably in assuming that some files containing incriminatory documents might not be scrupulously labeled.

■ In conclusion, this court finds that the agents' cursory examination of *all* the files and their review of the Dictaphone tapes, in order to search for the material listed in the warrant, were constitutionally permissible. *Id.*

■ As to Derman's second argument, the fact that the Government returned two files is not evidence of the over-breadth of the search. Addressing a similar situation in *United States v. Cardiges,* 881 F.Supp. 717 (D.N.H.1995), the court held that "[t]he government's actions in locating and returning documents outside the scope of the warrant provide additional support for the court's finding that the lawful part of the search was *not* merely pretextual." *Id.* at 723 (emphasis added). In this case, the fact that the Government returned the two files reflects its good faith, not its bad intent.

Finally, as to Derman's third contention, the court finds that paragraph nine in the "Items to be Seized" document annexed to the warrant authorizes the seizure of the diaries and message pads because they are items that could reflect communications between Derman and the targets.

In sum, because the Government did not exceed the scope of the search warrant for Derman's law office, and no improprieties have been even colorably suggested at any of the other three search locations, no violation of the Fourth Amendment occurred, and Derman's Motion to Suppress will be denied.

## IV. DERMAN'S MOTION TO DISMISS

Under the criminal code, a five-year limitations period applies for most non-capital offenses. 18 U.S.C. § 3282. The limitations period begins to run with the last overt act of the conspiracy. *United States v. Doherty,* 867 F.2d 47, 60–61 (1st Cir.), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989). The second superseding indictment charging Derman with money laundering in Count Five was handed down by the Grand Jury on October 10, 1996.

■ Derman appears to concede that the indictment alleges eleven acts within the limitations period—that is, between October 10, 1991 and October 10, 1996—but argues that there is no evidence that the transactions were in furtherance of any criminal activity, or that Derman committed the alleged acts with the intent required under the conspiracy count. This attack, however, is properly directed at the Government's proof at trial, not at the sufficiency of the indictment on its face.

It is true that in *Doherty,* as defendant points out, the Court of Appeals held that, at trial, the prosecution had failed to prove that the conspiracy occurred within the limitations period, because the only evidence of the ongoing conspiracy was the defendant's receipt of valid noncriminal payments and because no evidence of concerted criminal activity was brought out during the Government's case-in-chief. *Id.* at 62. In *Doherty,* the charged conspiracy had stopped, except for the receipt of undeserved raises; here Derman's financial transactions are alleged to be part and parcel of the conspiracy.

In short, since the misconduct alleged is within the limitations period and validly

charges a conspiracy, Count Five is not barred by the statute of limitations.