**UNITED STATES of America, Plaintiff,**

v.

**Michael ABBELL, William Moran, et al., Defendants.**

**No. 93–0470–CR.**

United States District Court, S.D. Florida.

April 3, 1997.

William Pearson, Asst. U.S. Atty., Ed Ryan, Asst. U.S. Atty., for U.S.

Howard Srebnick, Krista Halla, Miami, FL, for Michael Abbell.

Martin Weinberg, Boston, MA, Albert Krieger, Miami, FL, for William Moran.

### ORDER DENYING MOTIONS TO SUPPRESS

HOEVELER, Senior District Judge.

THIS CAUSE comes before the Court on Defendant Moran's Motion to Suppress,[1] which was adopted by Defendant Abbel;[2] Defendant Abbell's Motion to Suppress Based on Manner of Execution of Warrant; Defendant Abbell's Motion to Suppress Based on Franks Violations; and Defendant Moran's Motion to Suppress evidence seized pursuant to second search warrant. This Order memorializes the ruling that has been implicit in this Court's prior determination that all of the seized items be subject to review by a Special Master, who was appointed by this Court's Order of December 13, 1995.

As a preliminary matter, the Court notes that this search and seizure effort by the United States presents numerous issues which are distinguishable both for their complexity and for their relative novelty. Many of the issues before the Court require application of inextricable layers of analysis—with threads of privilege and constitutional rights each demanding independent attention. My decision to deny each of the motions to suppress reflects my ultimate conclusion that the warrants which were issued by the Magistrate Judges were based on practical determinations that probable cause existed to search the indicated premises, and that such probable cause was supported by the affidavits filed with the applications. In addition, I have determined that the seizures, although broad and necessarily invasive, were conducted in a manner which, although not flawless, was not unreasonable. This determination does not foreclose all relief for Defendants, as the Court will entertain further argument regarding specific documents sought to be admitted at the trial of this case in the event that additional justification for suppression or other valid grounds for objection are revealed.

After reciting pertinent facts to provide a contextual background, the Court will address the Defendants' motions to suppress the fruits of the first search warrants, with specific attention to the arguments regarding probable cause, overbreadth/particularity and manner of execution of the warrants, followed by a discussion of the arguments raised regarding the second search warrant.

1. The Motion to Suppress was denied by United States Magistrate Judge Brown on February 5, 1996, with leave to renew upon issuance of the Special Master's report on the documents under review. Defendant Moran renewed the Motion on July 18,

2. *See* this Court's Order *Granting Motion to Adopt,* October 29, 1996.

## BACKGROUND [3]

On September 2, 1994, United States Magistrate Judge Attridge of the District of Columbia authorized a search warrant for the law office of Michael Abbell in Washington, D.C. On September 5, 1994, United States Magistrate Judge Garber of the Southern District of Florida authorized a warrant to search several law offices in Miami, including the law office of William Moran. These warrants issued upon the Magistrate Judges' review of a 93 page affidavit of Special Agent Edward Kacerosky (of the United States Customs Service), dated September 1, 1994, which was submitted under seal in support of the applications for the warrants. The affidavit was unsealed as to the majority of its contents on September 12, 1994.

In the affidavit, Agent Kacerosky stated that he had directed an investigation of the Rodriguez–Orejuela organization of the Cali Cartel since November 1991, and that such investigation targeted cocaine trafficking and money laundering activities in Miami and other locations. Affidavit, ¶ 2. Based on that investigation, Agent Kacerosky stated that there was probable cause to believe that Abbell and Moran (and other attorneys) "effectuated and facilitated the almost unabated, successful narcotics trafficking of the Rodriguez–Orejuela organization". Affidavit, ¶ 7. The role of the attorneys allegedly encompassed:

(a) serving as defense counsel for organization members arrested at the request of the heads of the organization, Miguel and Gilberto Rodriguez–Orejuela, in order to assure the organization that these individuals will [sic] not cooperate against the organization;

(b) acquiring and providing evidence and information on the government's investigations and prosecutions of the organization in order for Miguel and Gilberto Rodriguez–Orejuela to monitor these law enforcement activities and learn how to avoid

significant disruption of the organization's criminal activities;

(c) serving as conduits for legal fees, bail monies and support payments or "payoffs" to the families of organization members arrested; and

(d) preparing, witnessing and/or acquiring affidavits, or similar sworn statements, from organization members arrested which falsely exculpate Miguel and Gilberto Rodriguez–Orejuela, and which are then presented to the components of the Colombian judicial system to serve as proof to rebut charges pending in the United States.

Affidavit, ¶ 7.

In concluding the affidavit, Agent Kacerosky lists thirty names of individuals who were charged with criminal narcotics offenses resulting from their involvement with the Rodriguez–Orejuela organization. Affidavit, ¶ 177. An additional 47 names are included as members or associates of the Rodriguez–Orejuela organization, based on Agent Kacerosky's "debriefings of sources of information, documentary evidence, wiretap intercepts and court files". Affidavit, ¶ 178.

The search warrants as issued by the Magistrate Judges expressly authorized the seizure of:

documents, files and other items including computer hard drives, computer floppy disks and computer diskettes for the names and companies specified in attachment "F" to the application for this warrant, all of which constitute evidence, fruits and/or instrumentalities of various violations of federal law, including, without limitation, Title 18, U.S.Code, Sections 2, 371, 1001, 1071, 1503, 1505, 1510, 1512, 1622, 1952, 1956 and 1957 and Title 21, U.S.Code Sections 846 and 963.

Search Warrant, Case No. 94–3029–GARBER, dated September 5, 1994. Attachment

---

**3.** Much of the procedural information contained herein has been stipulated to by the United States and Defendant Moran, *see Stipulated Chronology and Exhibits for August 28 Hearing on Motion to Suppress,* filed August 27, 1996. In addition, Defendant Abbell has submitted the October 3, 1994, declaration of his law partner,

Bruno Ristau, which provides procedural detail regarding the search executed on the law firm of Ristau & Abbell, *see Defendant's Motion to Suppress,* filed October 21, 1996. The United States has not disputed the accuracy of the Ristau affidavit.

F to the affidavit, containing a list of 114[4] names of individuals and entities, directed that the search cover the time period beginning in 1983 to the present, regarding:

> all documents, files and other items, including those on electronic data processing and storage devices, computers and computer systems including central processing units; internal and peripheral storage devices such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices or other memory storage devices; peripheral input/output devices such as keyboards, printers, video display monitors, optical readers, and related communications devices such as modems; together with system documentation, operating logs and documentation, software and instruction manuals; and any and all records showing or bearing indicia of the use, ownership, possession, or control of the computer equipment, accessories, telephone(s) and modem(s); any and all tapes, cassettes, hardware, computer disks, data disks, magnetic media, floppy disks, tape systems, CD ROM disks, optical data storage media, hard disks, and other computer related operational equipment, pertaining to: [list of 114 individuals and entities].

Attachment F to Affidavit of Agent Kacerosky.

Attachment F also provided for the search of information regarding financial transactions, address books, calendars, telephone records, travel information (airline ticket receipts, etc.), corporation records, and attorney billing statements for the 114 identified individuals and entities.

On September 7, 1994, attorneys from both the United States Attorney's Office and the Department of Justice attended an orientation meeting in Miami with the search team leaders and searching agents regarding the search procedures to be utilized. On September 9, a team of fifteen agents, accompanied by Department of Justice Attorney McGowan, executed the warrant for the search of Defendant Moran's law office. The search began at 10:30 a.m. and continued for ten hours. Approximately twelve boxes and several computer disks and hard drives were removed from the law office. Concurrently, a team of twelve agents executed the warrant for the search of Defendant Abbell's law office in Washington, D.C. No attorney for the Government was present. That search began at 10:15 a.m. and continued for eleven hours. The agents seized fourteen boxes of files, four computers and all computer equipment, manuals, and software from the Ristau and Abbell law office. That same day (September 9), Magistrate Judge Garber authorized a search warrant for the storage facility used by the firm of Moran & Gold. Another search team, comprised of eight agents and Department of Justice Attorney Bostick, executed the warrant at 6:50 p.m. and seized seventeen boxes of files from the storage facility.

Agents copied and Bates-stamped documents for several days immediately following the seizure. Attorneys from the Department of Justice also commenced a preliminary review to isolate those documents which were clearly privileged. During this time, Defendant Moran's counsel asserted privileges over all client files and computer documents containing such files and requested that all seized items be provided to the Court for an attorney-client and work product privilege review. (Counsel for Defendant Abbell's firm had engaged in similar exchanges with the Department of Justice on the date of the search.) Counsel for the Department of Justice advised Defendant Moran that several files seized from the storage facility were outside the scope of the warrant and would be returned to Defendant Moran.

Within one month of the seizure, copies of all seized documents were provided to Defendants, and originals of those documents which were deemed unresponsive (i.e., out-

---

4. Although the list is numbered from 1 through 118, the Court observes that five names appear in duplicate (Richard Carlyle: # 66, # 86; Oscar Rabasa: # 65, # 87; Julian Murcillo–Posada: # 38, # 93; Eduardo Rosales: # 82, # 113; Luis Santacruz–Echeverri/Santa Cruz–Echeverri: # 88, # 114). Additionally, the list includes two items numbered 61 (to reflect that the name of the attorney whose office was being searched should be deleted from the overall numbering). Thus, the actual count is 114 names.

side the scope of the warrant) were returned.[5] All of the computers and a copy of all seized documents were maintained by federal law enforcement agents (United States Customs Service).

This Court appointed a Special Master on December 13, 1995. Pursuant to the Court's direction, the Special Master conducted a document-by-document review of the seized materials and prepared recommended determinations as to the responsiveness of the materials and whether any privilege applied. This review necessitated analysis of the applicability of the crime-fraud exception to any assertion of privilege.[6] The Special Master prepared draft indices summarizing his determinations, to which the parties submitted comments/objections. Reports containing the Special Master's conclusions have been submitted to the Court on a continual basis, commencing in May 1996 and continuing until the present. Reasonable estimates of the number of documents reviewed by the Special Master number in the thousands, of which many consist of multiple pages.

While this review was proceeding, and more than two years after the original searches took place, the United States sought another search warrant. On October 15, 1996, Agent Kacerosky submitted a 25-page affidavit in support of the application for a second search warrant. On that same date United States Magistrate Judge Brown of the Southern District of Florida issued a warrant to search for items pertaining to seven names identified in the second affidavit. The search was authorized to be executed at the government evidence rooms of the HIDTA Building in Miami (the location of a joint narcotics trafficking eradication venture between federal, state and local law enforcement). The warrant specifically incorporated attachment A of the second affidavit, which directs a search for:

Documents, files and other items, including those on computer floppy disk, computer diskette, and computer hard drives, or mirrored copies thereof, *previously seized* from the office of Moran and Gold, P.A. and pertaining to: [seven individuals who were not named in the first affidavit] all of which constitute evidence of violations of Title 18, United States Code, Sections 2, 1503, 1510, 1512, 1956, 1957 and 1962, and Title 21, United States Code, Sections 846 and 963.

*Search Warrant,* Case No. 96–3612–STB (emphasis added). It appears that the warrant was executed shortly after issuance. The Special Master is currently reviewing the seized items from Moran's law office for responsiveness to the second search warrant.

## ANALYSIS

Defendants urge this Court to suppress the fruits of the searches on several grounds. First, Defendants argue that Agent Kacerosky's affidavit did not establish probable cause to believe that evidence of criminal conduct would be found at the locations to be searched. Defendant Abbell alleges that the affidavit contained false representations or those made with reckless disregard for the truth[7] and asserts that the remainder of the affidavit does not establish probable cause, *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Second, Defendants assert that the warrants were overbroad and also failed to satisfy the particularity requirement of the Fourth Amendment. Third, the scope of the search itself has been attacked as beyond the scope of any supportable warrant. Defendant Abbell adds that the manner in which the search was executed at his law office, e.g., the failure to have an attorney present from the Department of Justice, demonstrated such a "callous disregard" for the Defendant's and others' constitutional rights that the seized items should be sup-

5. Defendant Moran submitted the October 21, 1994, affidavit of his law associate, Lawrence Kerr, describing the return of copies of various documents on September 21 and 23, 1994, *see Exhibit E to Defendant's Motion to Suppress.*

6. Further background regarding this search/seizure and the appointment of the Special Master

is found in this Court's *Order on Issues Related to Special Master's Review,* August 9, 1996.

7. Defendant Abbell seeks a hearing to establish whether Agent Kacerosky's actions were deliberate.

pressed. Finally, Defendants argue that no officer could have relied on the warrants in objective good faith.

The United States responds that the Magistrate Judges necessarily considered the numerous layers of evidence referenced in the lengthy affidavit, viewed collectively and against the background of this extensive investigation, and found more than a sufficient basis for issuance of the search warrant. The Government also argues that Defendant Abbell has failed to show any intentional misrepresentations by Agent Kacerosky which would merit a *Franks* hearing. In addition, the United States claims that the warrant was sufficiently particular to satisfy the Fourth Amendment, in that documents to be seized were limited to those pertaining to the names on Attachment F. Moreover, the Government argues that the Special Master's review has remedied any problems identified by Defendants [8] concerning execution of the search warrants. The Government also notes that careful procedures including substantial directions provided to searching agents,[9] accessibility to a Department of Justice attorney during the search,[10] and the designation of a "taint team" of attorneys— separate from the prosecution—for review of the seized materials all demonstrate the Government's good faith attempt to respect the Defendants' constitutional interests. In addition, the Government argues that the seizure of the complete computers and all disks represented the only alternative which would minimize disruption to the law offices—since copying all of the contents would have required substantial time at the premises.

The Court will first examine the affidavit in light of the arguments regarding probable cause, and then will turn to analysis of the overbreadth/particularity issue.

## I. PROBABLE CAUSE

A search warrant may be issued only when there is probable cause to believe that an offense has been committed and that evidence may be found at the place for which the warrant is requested. *Zurcher v. Stanford Daily,* 436 U.S. 547, 558, 98 S.Ct. 1970, 1977–78, 56 L.Ed.2d 525 (1978). The Court's analysis of probable cause is premised on the Fourth Amendment to the United States Constitution:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const., amend. IV. "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). The task of a magistrate judge, when issuing a warrant, is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there exists a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332. Thus, a reviewing court should not engage in *de novo* or "hypertechnical" review of an affidavit. *Id.* at 236, 103 S.Ct. at 2331; *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745–46, 13 L.Ed.2d 684 (1965).

Agent Kacerosky's affidavit was incorporated into the warrant through mention of Attachment "F" (a list of names directing agents to search for documents relevant to those names) to the affidavit, and therefore it may be considered together with the warrant

---

**8.** *See, United States Supplemental Response to Defendant Moran's Motion to Suppress,* filed August 22, 1996 ("[t]he United States freely concedes and stipulates that some non-responsive documents were seized during the search.").

**9.** Attachment G to the Affidavit/Warrant is entitled "Instructions to [Searching] Agents". At-

tachment G was prepared by the United States Attorney's Office for the Southern District of Florida. Affidavit, ¶ 181.

**10.** Attachment H contains "Instructions to [Government] Attorneys."

when reviewing the determination made with respect to probable cause. *United States v. Wuagneux*, 683 F.2d 1343, 1351 n. 6 (11th Cir.1982). A magistrate judge's decision that probable cause exists is considered conclusive absent a showing that the decision was arbitrary. *United States v. Long*, 674 F.2d 848, 852 (11th Cir.1982). As stated by the Eleventh Circuit,

> [I]ssuing magistrates ... must strike a delicate balance between constitutional guarantees against excessive intrusions into areas of individual freedom and the Government's need to access and to secure relevant evidence in criminal prosecutions.... In recognition of the difficulty inherent in discharging this responsibility, reviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.

*United States v. Miller*, 24 F.3d 1357, 1363 (11th Cir.1994).

### a. Nature of the allegations

■ A magistrate judge's decision to issue a search warrant is necessarily guided by the information presented regarding the specific offense which was allegedly committed. In essence, the nature of the offense is the foundation upon which the need for the search is constructed. The alleged offense conduct in this case is ponderous: the quantity of cocaine involved—approximately 200,-000 kilograms [11] (Affidavit, ¶ 7), the use of sophisticated methods of concealment to facilitate importation, the international organization controlled from Cali, Colombia and operating for at least the past ten years, with the location of United States-based "cell" managers for the organization in Miami, New York and Houston (Affidavit, ¶ 2), and the attorney's alleged participation in a conspiracy to obstruct justice—all present the Court with some novel questions.

The main thrust of the allegations regarding Defendants Abbell and Moran is that these two attorneys engaged in acts which intentionally frustrated the Government's investigation into ongoing cocaine trafficking

activities of the Cali Cartel, and that such conduct crossed over the line drawn between vigorous advocacy on behalf of a specific client charged with a past crime and general protection of an illegal organization participating in ongoing criminal activity. Specific allegations include the gathering of affidavits which falsely exculpated the deans of the Cali Cartel, the representation of certain individuals in such a manner as to protect these leaders of the Cali Cartel (including unsolicited visits to newly-arrested organization members to ensure that they did not reveal significant information), the acceptance of fees from the Cali Cartel, and the payment of subsistence money to witnesses and their families to encourage their abstention from Government cooperation. Essentially, the affidavit alleges that Abbell and Moran conducted organization-related business in the guise of criminal defense work, to the primary benefit of Miguel Rodriguez–Orejuela and others—undisputed leaders of the Cali Cartel.

Defendants claim that the acts which they are alleged to have undertaken were unexceptional, routine tasks performed by criminal defense attorneys and that none of the acts was illegal. For example, Moran argues that even if he were present in Cali at a meeting with Miguel Rodriguez–Orejuela, and even if he discussed documents regarding the Government's case against the organization, the purpose of such a meeting was legitimate. While this argument may be technically correct, the Court notes that an overt act in furtherance of a conspiracy may itself be an innocent act. *Braverman v. United States*, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942). "[A]cts which are not inherently criminal may become criminal and support a finding of probable cause if committed to further an ongoing conspiracy." *United States v. Harris*, 20 F.3d 445, 451 (11th Cir.1994) (finding that warrant was not based on "stale" information since ongoing activity—although not illegal per se—supported allegations of continuing conspiracy).

---

11. Approximately 30,000 kilograms of which had been seized prior to the time at which the warrants were issued. Affidavit, ¶ 8.

Agent Kacerosky's affidavit relies on several sources of information, many of whom were managerial level employees of the Rodriguez–Orejuela faction of the Cali Cartel. For example, one of these sources, George Lopez, a cooperating co-defendant[12] who directed the Miami "cell" for the Rodriguez–Orejuela organization for a total of six years, stated that he observed and was briefed on meetings which occurred in Miguel Rodriguez–Orejuela's home in Cali, Colombia, between Rodriguez–Orejuela and attorneys Abbell, Moran, Francisco Laguna,[13] and Robert Lopez.[14] Lopez recounted that Miguel Rodriguez–Orejuela spoke with him on multiple occasions concerning his designed use of attorneys as organization counsel, including Moran, Lawrence Kerr (Moran's law associate), Moore, Laguna, Abbell and Joel Rosenthal, in order to protect Miguel Rodriguez–Orejuela, his brother Gilberto, and the organization. Affidavit, ¶ 10(a). Another source, Harold Ackerman,[15] who directed the organization's operations in Miami for approximately two years until his arrest in April 1992, provided similar information regarding the directives of Miguel Rodriguez–Orejuela concerning payments to attorneys working for the organization. Affidavit, ¶ 10(b), 101.

Agent Kacerosky attests that the information regarding the attorneys' role in the organization has been corroborated through "consensual tape recordings involving attorney Francisco Laguna, debriefings of organization members from whom [allegedly false exculpatory] affidavits have been obtained, a review of jail visitor logs, interviews of independent attorneys hired by Ackerman and other defendants, and from a review of evidence either seized during a search warrant executed on March 11, 1994 at the law office of Joel Rosenthal, or later turned over by attorneys representing Rosenthal." Affidavit, ¶ 71. The Court will address the specific allegations of the affidavit first with respect to Abbell, and then Moran.[16]

*1. Specific findings of probable cause as to Abbell*

█ Agent Kacerosky's affidavit alleges that while representing Miguel Rodriguez–Orejuela,[17] Abbell performed such acts as knowingly gathering a falsely exculpatory affidavit from an arrested organization member, appearing at meetings at Rodriguez–Orejuela's home in Cali, and—in cooperation with his law associate Francisco Laguna—arranging for a witness to appear on Rodriguez–Orejuela's behalf in Colombian courts. For example, Agent Kacerosky details an intercepted phone call between Abbell and Thomas Paul Gray on August 31, 1993, regarding funds being sent by Abbell (through Laguna) for Gray's trip to Colombia to testify.[18] Affidavit, ¶ 97. Gray, who was subsequently arrested on narcotics conspiracy charges in the Eastern District of Louisiana, stated that the funds were provided by Laguna for Gray's trip to Cali, Colombia, on September 13, 1993. American Airlines records reflect that such a trip also was taken by Laguna on that same date. Affidavit, ¶ 97.

The affidavit includes descriptions of several other instances in which Abbell and Laguna were operating in tandem. During the

**12.** George Lopez subsequently entered a plea of guilty, on September 29, 1994, to conspiracy to import cocaine.

**13.** On April 20, 1995, Laguna entered a plea of guilty to conspiracy to import cocaine and obstruction of justice.

**14.** On May 30, 1995, Moore entered a plea of guilty to money laundering in a one Count sealed Information, which was unsealed on June 5, 1995.

**15.** Ackerman was convicted in April 1993 in a separate criminal proceeding, *United States v. Ackerman*, 92–0262–CR–GRAHAM. Affidavit, ¶ 10(b).

**16.** It should be noted that the searches extended to other attorneys' offices: Francisco Laguna, Donald Ferguson, and Robert Moore. Each of those attorneys has entered a plea of guilty in this case. The pending motions to suppress, filed by Defendants Abbell and Moran, dictate the scope of this Court's analysis of the affidavit in support of the search warrant and the manner of execution of the warrants—which is thus limited to the claims of Abbell and Moran.

**17.** Abbell acknowledges that Miguel and Gilberto Rodriguez–Orejuela were his clients, *see, Motion to Suppress Based on Franks Violations.*

**18.** It appears that the testimony was to be offered in defense of the Rodriguez–Orejuelas.

time of the alleged conduct, Abbell was a partner in the Washington, D.C., law firm of Ristau & Abbell, while Laguna was an attorney practicing in Miami (at his residence which also served as his office) as an associate (contract partner) of the firm.[19] Without making any specific findings as to the nature of the contractual relationship between Ristau & Abbell and Laguna, the Court observes that Laguna appeared to be operating rather independently at times. Despite this observation, it is nevertheless true that the Magistrate Judges were presented with a voluminous affidavit, containing several allegations which jointly implicate Abbell and Laguna. As a part of the Magistrate Judges' duty to make a "practical decision", Gates at 238, their responsibility included the extraction of independent grounds for authorizing a separate search warrant for Abbell's law office. Conduct in which Abbell engaged does not become irrelevant to the practical decision making process simply because Laguna was involved.

For example, while awaiting trial, Ackerman was visited at the Federal Correctional Institute in Tallahassee, Florida, in September 1992, by Laguna and asked to sign affidavits, which were acknowledged by Laguna to be false, stating that Ackerman never met or knew Miguel Rodriguez–Orejuela. Ackerman was visited again by Laguna, then accompanied by Abbell, concerning similar affidavits—although no affidavits were presented on that subsequent visit. Affidavit, ¶¶ 146, 147. Ackerman's attorney, Edward Shohat, confirmed that he spoke to Abbell regarding the affidavits—which Shohat advised his client to refuse to sign. Shohat reported that he told Abbell that no attorney from Abbell's office should contact Shohat's client, Ackerman. Affidavit, ¶ 149.

As another example of information from which the Magistrate Judge could have extracted a basis for probable cause as to Abbell, the affidavit notes that the same money exchange house, La Raza Express in Hous-

ton, Texas, which wired money directly from Miguel Rodriguez–Orejuela into the account for the attorney of an arrested organization member, was also the source of deposits into a trust account at Riggs International Bank in the name of the Ristau & Abbell firm. Affidavit, ¶ 163. That same trust account was utilized by Abbell to make payments to Laguna in amounts matching deposits made into the account just prior to the payments. Affidavit, ¶ 164. At a recorded meeting with Maggie Marti (the wife of the arrested organization member noted above), on April 16, 1994, Laguna advised her that he had confirmed that $100,000 from Miguel had arrived in the bank account of Marti's attorney, Daniel Forman.[20] Affidavit, ¶ 162. During the recorded meetings between Maggie and Laguna, Laguna mentioned that money transfers from the organization were frequently made in the form of wire transfers. Affidavit, ¶ 164. Thus, it appears that the Magistrate Judge could have found support for his probable cause determination as to either Abbell or Laguna or both, from the above recited incidents.

In a related example of the nature of the attorneys' activities, Raul Marti, who was facing charges *in United States v. Austin, et al.,* No. 93–0421–CR–FERGUSON (he subsequently pleaded guilty), was previously visited at the Miami MCC in April 1994, by Laguna and Donald Ferguson.[21] The two attorneys "openly questioned Marti regarding whether or not 'he had kept his mouth shut' about the organization." Affidavit, ¶ 153. During a recorded meeting on April 9, 1994, between Laguna and Maggie Marti, Laguna acknowledged that he was acting on behalf of Miguel Rodriguez–Orejuela, and stated that the affidavits (similar to one which Laguna had presented to Raul for signature) were collected to prevent or contest prosecution of Miguel in Colombia. Affidavit, ¶ 156.

---

**19.** Laguna previously worked in the Washington, D.C. office, but had relocated his residence to Miami in mid–1992. *Motion to Suppress,* p. 14.

**20.** Attorney Forman confirmed that $100,000 was received in his trust account, which is also

substantiated by wire transfer records for the date of that transfer, April 12, 1994.

**21.** On June 21, 1995, Donald Ferguson entered a plea of guilty in this case to charges of conspiracy to obstruct justice and money laundering.

Pedro Isern is another source of information supporting the determination of probable cause as to Abbell. Isern had been involved with the Cali Cartel since 1986, was arrested on charges pending in the Ackerman case and was brought to the United States from Venezuela in March 1994. Affidavit, ¶ 169. While housed at Miami MCC, Isern began cooperating with the United States. Shortly after Isern's wife placed a call to an associate of Miguel Rodriguez–Orejuela in Cali, Colombia, to alert the organization of Isern's arrest, attorney Don Ferguson visited Isern at MCC. Isern told Agent Kacerosky that Isern had never met Ferguson nor requested his services. Affidavit, ¶ 170. At the direction of the United States, Isern recorded several meetings with Ferguson. Ferguson stated that he had worked with Abbell for the past five years and that he met Laguna through Abbell. Ferguson also "stated or implied," according to the affidavit, that he, Laguna and Abbell were the attorneys who represented the interests of Miguel Rodriguez–Orejuela. "Ferguson informed Isern that cooperation of any kind [with the Government] would be unacceptable to Miguel". Affidavit, ¶ 171. The Court notes that this advice against cooperation appears to have been unrelated to a benefit for Isern and, thus, may be evidence of an attempt to obstruct justice.

As additional support for the Magistrate Judges' findings of probable cause, the Court notes that telephone records reveal that phone and fax numbers identified as contact numbers for Miguel Rodriguez–Orejuela in Cali, Colombia, were called from the law office of Abbell in Washington, D.C. and from Laguna's former Miami residence. Affidavit, ¶ 172. During intercepted telephone conversations between Laguna and a secretary of Miguel Rodriguez–Orejuela in Cali, Colombia, Laguna reported on an August 4, 1994, trip with "Dr. Abbell" to Cali, and reported on his efforts to acquire transcripts,

docket sheets, and affidavits from Miami, New York and elsewhere for Miguel. During these conversations Laguna also requested funds to pay for an attorney for an arrested organization member and arranged support payments for the wife of Carlos Torres—who was under arrest. Affidavit, ¶ 173.

The Magistrate Judges were provided with numerous allegations regarding each of the attorneys as to whom search warrants were solicited. The Court cannot gainsay what the Magistrate Judges understood regarding the contractual relationship among those attorneys, specifically between Abbell and Laguna. However, the affidavit contains sufficient allegations as to Abbell individually to establish probable cause—even absent any professional association with Laguna. Thus, despite Abbell's claim that his own conduct consisted of "patently routine" acts of a criminal defense attorney, and that Laguna was operating without the control or consent of Abbell when Laguna's conduct crossed the line of proper criminal defense representation, the Court concludes that Magistrate Judge Attridge could have found probable cause that a crime had been committed and that a search warrant should issue for Abbell's law office.

## 2. Specific findings of probable cause as to Moran

In October 1993 Moran told Agent Kacerosky that Moran had served as counsel in the United States for Gilberto and Miguel Rodriguez–Orejuela since 1984 (when he was introduced to Gilberto[22]). Affidavit, ¶ 100. When Agent Kacerosky interviewed cooperating co-defendant George Lopez on July 9, 1994, the day after his arrest, he confirmed this statement by Moran. Affidavit, ¶ 101, 103. Thus, the affidavit establishes that Miguel and Gilberto Rodriguez–Orejuela were clients of Moran. Allegations regarding Moran's role as the attorney and contact

**22.** Moran was introduced to Gilberto Rodriguez–Orejuela in a Spanish prison, while Moran was visiting a client, Jorge Luis Ochoa. Affidavit, ¶ 100. Rodriguez–Orejuela was extradited from Spain to Colombia in 1986, after having been arrested in Spain in November 1984, ¶ 11–12. Subsequent to the indictment in the mid–1980s of Gilberto Rodriguez–Orejuela in the Eastern District of Louisiana, the United States requested that Rodriguez–Orejuela be extradited from Colombia. Affidavit, ¶ 99. In 1990, the Colombian Supreme Court declared unconstitutional the extradition treaty between Colombia and the United States. Affidavit, ¶ 72. It appears that Rodriguez–Orejuela has never personally appeared before a United States tribunal.

person for the organization are supported by Ackerman's statements. Ackerman, a former member of the organization, stated that he was introduced to Moran by George Lopez, and was told that Moran should be contacted if anyone within the organization was arrested in Miami. Affidavit, ¶ 105.

While acting as counsel for the Rodriguez–Orejuelas, Moran allegedly coordinated the legal representation of organization members—although he himself only occasionally entered an appearance on their behalf. (Moran directly represented Cados Giron, Affidavit, ¶ 100; Miguel Sossner, Affidavit, ¶ 104; Carlos Torres, Affidavit, ¶ 117; and George Lopez, Affidavit, ¶¶ 122–128.) This allegation is supported by information from former clients and co-defendants of Moran's former clients, and by statements of criminal defense attorneys who were involved in the pertinent cases. For example, Lopez stated that he was directed by Miguel Rodriguez–Orejuela to deliver two sums of cash totaling $85,000 to Moran's office in 1989 or early 1990, to cover expenses related to representation of two organization employees who had been arrested. Affidavit, ¶ 104. In addition, Ackerman has stated that a payment of $40,000 in early 1991 and another payment of $12,000 in October 1991 were made to Moran in response to instructions from Miguel Rodriguez–Orejuela. Affidavit, ¶ 106. Lopez was present at a May 1992 meeting in Miguel Rodriguez–Orejuela's home in Colombia which was attended by Moran, during which Ackerman's arrest (on April 23, 1992) was discussed. Lopez stated that at this meeting Miguel Rodriguez–Orejuela "assigned" Moran to represent Carlos Giron, a co-defendant of Ackerman. Both Lopez and Ackerman have stated that Moran was paid a substantial fee by Miguel to ensure that Giron not cooperate with the Government and, if necessary, that Giron proceed to trial. Affidavit, ¶ 109. This statement is supported by Department of Treasury records reflecting that Moran executed a CMIR report on May 7, 1992, declaring that he was transporting $106,000 in currency and checks. Affidavit, ¶ 112. Also, according to the affidavit, when

attorney Joel Rosenthal asked Miguel Rodriguez–Orejuela about representing any of the other Ackerman co-defendants, Miguel told Rosenthal to ask Moran. Moran subsequently told Rosenthal that Moran's associate, Lawrence Kerr, had already hired a lawyer for each of the other organization members then charged. Affidavit, ¶ 110. Ackerman and Giron both went to trial and were found guilty of various charges.

On December 13, 1993, this Court conducted an *in camera* proceeding upon the request of the United States, as referenced in footnote 2 of the affidavit and at ¶ 115. This proceeding concerned the intended cooperation of a then-recently arrested individual who would serve as a confidential source, "CS–5." [23] The debriefing of CS–5 regarding prior events revealed that, in August 1992, Moran advised CS–5 to call Moran's office from a pay phone, rather than from the cellular phone used initially by CS–5 when calling Moran. "Moran advised CS–5 'to get the hell out of here' and 'to go back to where they had met,' which meant Cali, Colombia according to CS–5, because Moran had learned that the Government would soon return new indictments as a result of the ongoing investigation." Affidavit, ¶ 114. CS–5 also stated that he reviewed wiretap affidavits, search warrant affidavits, indictments, documents and investigative reports relating to the investigation of the Cali Cartel coincidentally with the meetings he observed in Miguel Rodriguez–Orejuela's home which were attended by Moran. Affidavit, ¶ 142. According to the affidavit, Rodriguez–Orejuela informed CS–5 that these documents were provided by his Miami attorneys. Affidavit, ¶ 142. CS–5 also stated that he had seen a copy of an affidavit, which was reportedly filed in a Colombian court, executed by a convicted defendant in a pending United States indictment which alleged that Miguel Rodriguez–Orejuela was unknown to that defendant, i.e. the affiant. Affidavit, ¶ 157. The Court is uninformed as to whether the Magistrate Judges were provided with additional information beyond that contained in

**23.** CS–5 is William Santos. On April 20, 1995, Santos entered a plea of guilty to conspiracy to distribute cocaine, which remained under seal until this Court's Order of July 27, 1995—which unsealed the plea agreement and plea colloquy.

the affidavit regarding the identity of CS–5 and, thus, can draw no conclusion regarding what additional basis may exist for their determination as to the veracity of this source; however, the Court does not conclude that the Magistrate Judges had any basis for rejecting this information from this source.

Another source of information, Pedro Isern, reviewed wiretap transcripts, documents and investigative reports concerning himself and other members of the organization which Miguel Rodriguez–Orejuela told him had been provided by some of "his Miami attorneys". Affidavit, ¶ 168. Telephone records reveal that phone and fax numbers identified as contact numbers for Miguel Rodriguez–Orejuela in Cali, Colombia, were called from the law office of Moran during the three years prior to the date of the affidavit. Affidavit, ¶ 119.

The affidavit outlines activities by Moran which were not limited to the "coordination" of defenses among organization members in other proceedings, but which extended to the present case as well. While George Lopez was awaiting his initial appearance in the Southern District of Florida on charges in the instant case, Moran visited him at the Miami Metropolitan Correctional Center. Lopez reported to Agent Kacerosky that during the visit on July 9, 1994, Moran offered to represent Lopez for "free", since he considered Lopez a friend. According to the affidavit, Lopez felt that Moran was insistent that he be utilized as counsel for Lopez. Affidavit, ¶ 121. Agent Kacerosky obtained approval from the Department of Justice to have Lopez make undercover recordings with Moran. Affidavit, ¶ 123. Just prior to a hearing before this Court on July 15, 1994, Moran and Kerr met with Lopez and their conversation was recorded. At this meeting Moran reiterated that he would represent

Lopez for free, and stated that in representing Lopez he (Moran) did not care " 'about anybody else, not Miguel' or anyone else". Affidavit, ¶ 126, quoting Moran. In response to a statement by Lopez that he did not want to fight the charges against him, Moran told him that there was always time to plead guilty or cooperate. Affidavit, ¶ 126. Subsequent to the hearing before this Court on July 15, 1994, a portion of which was conducted *in camera*, Moran withdrew from representing Lopez, citing a conflict which had arisen. Affidavit, ¶ 128.

This apparent effort by Rodriguez–Orejuela, acting through and with Moran from at least early 1990 until mid–1994, to coordinate the defense of individual members of the organization represents the quintessential activity alleged by the United States to be evidence of the attorneys' roles in the organization. Although Moran urges this Court to accept the premise that meetings held at the home of a Colombian national who was charged or soon to be charged in cases in the Southern District of Florida [24] for the purpose of "coordination of the defense of the Ackerman defendants" constitute a lawful activity, the Court finds no precedent to support a conclusive finding on this issue. If the affidavit presented a single incident of questionable behavior—e.g., the offer to represent Lopez without fee, the Court would easily find merit in Defendant's argument. Such is not the case. The context provided within the affidavit lends a more incriminating interpretation to the statements and events recited therein.

The allegations in this case are not entirely without precedent. *See, e,g., United States v. Bascaro,* 742 F.2d 1335, 1342 (11th Cir. 1984) (attorney who represented organization members in related criminal matters was the "functional equivalent of 'house counsel' ");

**24.** Charges were filed against Miguel Rodriguez–Orejuela pursuant to the Superseding Indictment of November 12, 1993 (and against Gilberto as of the Second Superseding Indictment filed on September 28, 1994) in *United States v. Austin, et al.,* Case No. 93–0421–CR–FERGUSON. On November 16, 1993, an arrest warrant was issued as to Miguel Rodriguez–Orejuela, see Docket # 65 of Case No. 93–0421–CR–FERGUSON. Charges were also filed against Miguel Rodri-

guez–Orejuela pursuant to the Second Superseding Indictment issued October 30, 1992, in *United States v. Ackerman, et al.,* Case No. 92–0262–CR–GRAHAM. On November 9,1993, Miguel Rodriguez–Orejuela was placed in fugitive status as to these charges, see Docket # 586 of Case No. 92–0262–CR–GRAHAM. Other charges against Moran's non-extraditable (as of 1990) clients may have been outstanding at the time that Moran was reported to be in Cali.

*United States v. Simmons,* 923 F.2d 934, 948–49 (2d Cir.1991)(in presence of suspicious circumstances, representation of several members of organization by same attorney was probative of the association between the clients; prosecutor's claim that attorney was "house counsel" was permissible). Agent Kacerosky's affidavit provides a relatively comprehensive, narrative description of the alleged conduct—supported by reference to investigative work conducted at his direction, or by other law enforcement officers who either briefed him or whose reports he read. The issuing Magistrate Judges reviewing this affidavit with a "practical, commonsense [approach] ... given all the circumstances set forth in the affidavit," *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332, could reasonably conclude that probable cause existed.

### b. Veracity and basis of knowledge of persons supplying information

■ Defendants have criticized Agent Kacerosky's repeated use of "double hearsay" statements regarding the intent with which Miguel Rodriguez–Orejuela retained counsel. *See, e.g., Moran's Memorandum in Support of Motion to Suppress,* filed August 23, 1995, p. 5. As counsel is aware, traditional evidentiary rules do not dictate a magistrate judges' "practical, common-sense decision", *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332, regarding probable cause. Defendants' concern as to the attenuated nature of Agent Kacerosky's knowledge must be viewed in light of the Magistrate Judges' assessment of the experienced law enforcement officer through whom such information was provided. As noted by the Supreme Court, the magistrate judge's determination includes an assessment of the "veracity and basis of knowledge of persons supplying hearsay information ...", *id.* Such assessment is not animated by an overly technical approach, but rather by a review of the "totality of the circumstances". *Id.* In determining the weight to give to the sources of information, a magistrate judge assesses the credibility of the testifying law enforcement officer as well as the credibility of the sources providing information to that officer.

The Eleventh Circuit has approved a magistrate judge's reliance upon a law enforcement officer's experience as one factor in assessing probable cause. *U.S. v. Jenkins,* 901 F.2d 1075 (11th Cir.1990). In *Jenkins,* the magistrate judge issued a warrant to search the home of a bank security guard, who was suspected of stealing funds from his employer. The search warrant specified the items missing from the depository vault, and the supporting affidavit contained the statement of an FBI agent (not the affiant) with ten years of experience in bank robbery investigation that "people who steal money are most likely to take it to their homes for safekeeping." *Id.* at 1079. The Eleventh Circuit found that the combination of several factors, including a finding that there was probable cause to believe the guard committed the crime and the statement of the experienced law enforcement officer as to the potential location of the stolen property, provided sufficient probable cause to justify a search of the perpetrator's home for the missing items from the vault. The Seventh Circuit has also addressed the issue, finding that probable cause existed to search an automobile where the supporting affidavit stated that there was a pattern of drug dealing involving the car and that the affiant, based on his nine years of experience with the local Drug Enforcement Unit, "knew that drug dealers often store drugs and drug paraphernalia in their automobiles." *U.S. v. Lamon,* 930 F.2d 1183, 1189 (7th Cir.1991). The court remarked that "[a]lthough conclusory statements without more do not provide a substantial basis for finding probable cause, issuing magistrates are 'entitled to take into account' the experience of officers whose affidavits explain the significance of specific types of information." *Id.* (internal footnote and citations omitted).

Agent Kacerosky has attested to his eighteen years of experience as a Special Agent for Customs and other federal agencies. Affidavit, ¶ 1. The Magistrate Judges could have found that this experience provided a substantial basis for Agent Kacerosky's analysis of information which was disclosed during the course of investigating the Cali Cartel. Agent Kacerosky asserts that the information in the affidavit was provided to

him either directly or indirectly by law enforcement officers, some of whom may have had hearsay knowledge of the statements which they reported to Agent Kacerosky during the course of this investigation. Affidavit, ¶ 6. Although the affidavit is silent as to the level of experience of the various law enforcement officers assisting with this investigation, the Magistrate Judges reasonably could have found that Agent Kacerosky's review of those officers' work—in light of his own substantial experience—supported a finding that an adequate basis of knowledge existed with regard to the statements of co-conspirators/members of the organization.

In this case, it was reasonable for the Magistrate Judges to rely upon the professional experience of the affiant. At the time, the affiant had been a Special Agent with Customs for many years, and had conducted a large scale investigation into the Cali Cartel since late 1991. The affiant had experience with the search of another attorney's office several months prior. Affidavit, ¶ 71. The attorney, Joel Rosenthal [25], was alleged to be engaging in similar conduct, Affidavit, ¶¶ 87–92. Agent Kacerosky's general knowledge of the activities of those engaged in drug-trafficking, in conjunction with specific information supplied by the informants either directly or indirectly through other law enforcement officers provided a substantial basis for the Magistrate Judges to conclude that the items described in the warrant would be discovered in Defendants' law offices.

Agent Kacerosky stated that he had been advised by at least four former managerial level employees, and a fifth (then-) active source, of a number of statements made by Miguel Rodriguez–Orejuela "concerning his reasons for the ongoing use of organization attorneys." Affidavit, ¶ 10. These sources were detailed in the affidavit, and Agent Kacerosky stated that the information had been corroborated by existing evidence obtained during the lengthy investigation. Affidavit, ¶ 10.

It is true that the affidavit does not provide substantial independent information to assist in assessing the veracity of the sources of information (e.g., George Lopez, Harold Ackerman, Pedro Isern, and "CS–5"); the affidavit does not address cooperation by these individuals in prior investigations, and it suggests that the only basis for appraising veracity is these sources' former managerial roles in the organization at issue in this case. These sources had access to pertinent information because of those roles. The lack of proven prior cooperation in Government investigations does not render an otherwise informative source incredible; rather, their corroboration increases the reliability of affiant's assessment.

The Eleventh Circuit has upheld a magistrate judge's finding of probable cause where the deficiency in the area of veracity was compensated for by a showing of "basis of knowledge." *United States v. Foree,* 43 F.3d 1572, 1575–76 (11th Cir.1995). In *Foree,* the informant visited the defendant's home and observed his indoor marijuana growing operation. Three weeks later, at the direction of law enforcement, she returned to the home and made similar observations. On a third occasion, she was taken, under constant police surveillance, by the defendant to another location where she made detailed observations. The Court found that one way to confirm independently an informant's veracity is to "creat[e] circumstances under which she is unlikely to lie.... Here the [informant] made her observations in the context of a controlled surveillance operation and reported intermittently to supervising officers, who corroborated her access to the target of the investigation. As her report consisted of facts readily verifiable upon a subsequent search by the police (x number of plants growing in y room), the [informant] was unlikely to be untruthful, for, if the warrant issued, lies would likely be discovered in short order and favors falsely curried would dissipate rapidly." *Id.* at 1576.

In the present case, several tape recordings appear to confirm the story told by the sources. This corroboration of the veracity

---

**25.** Joel Rosenthal subsequently entered a plea of guilty to money laundering. The plea was entered to a sealed Information on May 29, 1995, which was unsealed on June 5, 1995.

of the sources satisfies the standard set forth in *Foree*. Agent Kacerosky was involved in this investigation for a period of time which preceded his involvement with the sources. The existence of previous independent involvement in the investigation (and the information available from such involvement), a fact not present in *Foree*, provides additional, independent corroboration of the sources' veracity.

While the information provided by Lopez, Isern and Rosenthal regarding statements made by Miguel Rodriguez–Orejuela regarding his use of Miami attorneys is not readily verifiable by law enforcement, other information provided by these sources, e.g., regarding trust account transfers and payments, is easily confirmed and, thus, provides a strong inducement for these sources to be truthful. In addition, the Magistrate Judges were advised through the affidavit that both Lopez and CS–5 had expressed their desire to assist in the investigation at appearances before this Court and, accordingly, the Magistrate Judges may have credited these sources with more credibility due to their ongoing dual role (as cooperating witnesses and members of the organization). Affidavit, ¶ 10, n. 2, ¶¶ 1 23–126.

### c. Defendant Abbell's request for a *Franks* hearing

■ If the issuing magistrate judge relies upon an affidavit which contained deliberate falsehoods or material omissions, suppression is required if the remainder of the affidavit fails to establish probable cause. *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978). An evidentiary hearing may be warranted when Defendant presents evidence of the deliberate nature of affiant's omission—negligence or mistake is insufficient. *United States v. Cross*, 928 F.2d 1030, 1041 (11th Cir.1991). In any event, suppression is required only if the remainder of the affidavit fails to establish probable cause. *Franks* at 155–56, 98 S.Ct. at 2676–77.

Defendant Abbell originally sought an evidentiary hearing on the basis of, *inter alia*, Agent Kacerosky's characterization of statements made by Ackerman's attorney, Edward Shohat. The pertinent statement is that Shohat "confronted Abbell about the contents of the affidavit [which Abbell had presented for Ackerman's signature] . . . as being contrived and totally false [regarding Ackerman's knowledge of Miguel Rodriguez–Orejuela]." Affidavit, ¶ 149. Subsequent to making the request for a hearing, Defendant Abbell's counsel contacted Attorney Shohat and, apparently, determined that Agent Kacerosky had accurately reported the content of Shohat's statements. Defendant Abbell now complains that Agent Kacerosky "misled" the Magistrate Judge by including the Shohat statement without a complete explanation as to the subsequent inaction of Abbell—i.e., Abbell did not take the affidavit from Ackerman.

Defendant Abbell also argues that paragraph 150 of the affidavit, regarding a visit by Abbell to a co-defendant in the Ackerman case (now known to be Juan Jose Guel) while incarcerated at the Federal Correctional Institution in Three Rivers, Texas, and the procurement of "an affidavit that falsely exculpates Miguel Rodriguez–Orejuela," Affidavit, ¶ 150, is another example of Agent Kacerosky's deliberate attempt to mislead the Magistrate Judges. In briefing this issue for the Court, the Defendant has argued that the affidavit was not false in that Guel did not personally know Miguel or Gilberto Rodriguez–Orejuela. The United States acknowledges that information was omitted by Kacerosky regarding whether Guel actually knew or had met Miguel Rodriguez–Orejuela— which was the subject of portions of the affidavit which was ultimately procured. That Juan Jose Guel's attorney (Walter Reynoso) had approved of the proposed affidavit—a fact the omission of which Defendant Abbell urges demonstrates Agent Kacerosky's deliberate attempt to mislead—was unknown to Agent Kacerosky at the time he submitted the affidavit. *See, Response to the Defendant's Motion to Suppress*, p. 7, n. 2, filed December 10, 1996. The Government maintains that even if aspects of the affidavit were technically correct, the substance of the affidavit remains as evidence of an attempt to falsely exculpate the Rodriguez–Orejuelas since Guel "by his own admission, was part of

a conspiracy that included Miguel and Gilberto Rodriguez–Orejuela as its leaders". *Response to the Motion to Suppress Fruits of Law Office Search Based on Franks Violations,* p. 7. The affidavit is silent as to the time of the visit by Abbell and does not include the Government's later assertion (contained in the Response) that Guel had admitted to a role in a Rodriguez–Orejuela conspiracy. This information would have assisted the Magistrate Judges in assessing the nature of Abbell's efforts to obtain the affidavit from Guel. Despite this omission, the Magistrate Judges had sufficient basis for an inference that the affidavit was questionable in the statement that the visited individual was a "co-defendant from the Ackerman case"—a case which involved several members of a Rodriguez–Orejuela conspiracy. Thus, the Court notes that this paragraph, i.e., ¶ 150 of the Affidavit, provided some support for the probable cause determination.

In conclusion, although it appears that Agent Kacerosky omitted information which would have assisted the Magistrate Judge in determining the accuracy of the hearsay statement regarding the veracity of the affidavit, the Court finds that such omission does not demonstrate the level of recklessness or intentional bad faith which merits an evidentiary hearing pursuant to *Franks v. Delaware.* This Court has sufficient confidence in the intellectual acuity of the Magistrate Judges who reviewed this affidavit, and subsequently issued the search warrants, to conclude that the alleged attempts to mislead—which have not been proven—would necessarily have failed. As Defendant Abbell has failed to make a showing that an evidentiary hearing is warranted, his request for suppression on this basis must be denied.

**d. Nexus between probable cause and documents for which search authorized**

■ Aside from the Defendants' vigorous attacks on the nature of the allegations in this case,[26] i.e., their claim that their conduct was not criminal but rather was the type of activity regularly engaged in by criminal defense attorneys, there remain questions as to the extensive listing contained in Attachment F and the required demonstration of a connection between the allegations and the location desired to be searched. The list included not only past and present clients of the lawyers identified in the body of the affidavit but also a large number of individuals and entities suspected by the United States of having a role in the Cali Cartel. For the most part, the required nexus has been established by reference to the use of specific types of documents, i.e., draft affidavits, which are likely to be located in a law office and by reference to the use of office telephone and facsimile equipment. As an example, the affidavit contains particularized support for a search of Abbell's computers: Agent Kacerosky reports that a document obtained from Rosenthal, styled "Draft Expert Opinion of Michael Abbell," included identification information which suggested that the document is stored in a computer or on a diskette in Abbell's office. Affidavit, ¶ 98.

■ Defendants might argue that there is insufficient support for a search of their law offices because none of the individuals providing information in the affidavit stated that the items specified in the warrant were located in the Defendants' offices. Further, the affidavit is silent as to any observations of the Defendants' offices; nowhere in the affidavit is there information regarding the interior of any of the law offices. However, the sources' failure to directly observe the items on the premises prior to the execution of the search does not render a fatal blow to the affidavit and the Magistrate Judges' determination as to probable cause. Firsthand or direct observation is desirable but not required. *United States v. Lockett,* 674 F.2d 843, 846 (1982) ("nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation").

---

**26.** Defendants have raised similar arguments in their various motions to strike and/or dismiss portions of the indictment. This Court's order on those motions is forthcoming.

It is undisputed that Attachment F contains an extensive listing; however, this fact is insufficient, without more, to reverse the issuance of the warrant. In *United States v. Weinstein*, 762 F.2d 1522 (11th Cir. 1985), the court reviewed a search warrant which authorized the seizure of "correspondence, invoices, canceled checks, check stubs, address books, diaries, and other documents typically used in a business organization", relating to a list of 28 individuals, companies, and organizations thought to be involved in a pharmaceutical fraud scheme. The court noted with approval the searching agent's reluctance to seize items containing names which appeared in the list, but which were not discussed in the affidavit which supported the warrant. This comment, in dicta, does not establish that the court would have invalidated the seizure of those items; in fact, the court ultimately approved their seizure, after execution of a second search warrant. *Id.*, at 1531.

If I were to agree with Defendants that certain documents—which contained names appearing in Attachment F but not appearing in the supporting affidavit—were beyond the scope of the warrant, the practical result might be that the Government would seek a second search warrant for Defendants' offices, correcting any weaknesses as to probable cause—at which time the documents might be seized. (On this point, see the following discussion regarding the second search warrant.) Given the extensive protections employed by the Special Master and this Court to ensure that Defendants' rights and privileges (and those of their clients) are observed, I am not prepared to say that the seizure of several documents which are outside the scope of the warrant must render this search unconstitutional. The 11th Circuit has stated, "[t]he nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved", *Lockett*, 674 F.2d at 846. Nonetheless, the Government must still demonstrate that there is a substantial basis for believing that the items specified in the warrant would be present at the location to be searched. *Id.* This issue is more appropriately addressed in the following discussion of Defendants' attacks as to the lack of particularity of the warrant.

## II. PARTICULARITY

Search warrants must particularly describe "the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. This requirement prevents "general, exploratory rummaging in a person's belongings", *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). The determination as to whether a warrant is sufficiently particular is dictated, in part, by the circumstances and nature of the activity charged. *See, e.g., United States v. Slocum*, 708 F.2d 587 (11th Cir.1983)—(reversing trial court's decision to suppress items related to transactions dated less than two years prior to date of factually similar transactions specified in warrant); *Wuagneux*, 683 F.2d at 1349 ("It is universally recognized that the particularity requirement must be applied with a practical margin of flexibility . . .").

The searcher must be able to reasonably ascertain and identify the things authorized to be seized. *United States v. Cook*, 657 F.2d 730, 733 (5th Cir.1981), *citing Steele v. United States*, 267 U.S. 498, 503–04, 45 S.Ct. 414, 416–17, 69 L.Ed. 757 (1925). This affidavit alleged criminal/conspiratorial conduct on the part of Abbell in at least two specific instances:[27] the visit to Ackerman/conversation with Attorney Shohat regarding false affidavits, and the recorded phone call to Gray in August 1993 apparently regarding payment for testimony. The specificity of this conduct made it reasonable for the Magistrate Judge to conclude that probable cause had been shown that Abbell had engaged in similar activities and that evidence of such conduct might be discovered at the premises to be searched. The affidavit provided details of these allegations, as well as statements regarding Abbell's visits to the

---

**27.** The visit by Abbell to an inmate (Juan Jose Guel) at the Federal Correctional Institution at Three Rivers, Texas, Affidavit, ¶ 150, regarding a falsely exculpatory affidavit, would constitute evidence of a third specific activity but, as this Court has discussed, *infra*, reliance on this paragraph may be misplaced.

home of Miguel Rodriguez–Orejuela—perhaps a nonextraditable fugitive at the time,[28] and multiple contacts between Abbell's office and telephone/facsimile numbers connected with Miguel Rodriguez–Orejuela in Cali.

Similarly, there exists allegations of at least three specific instances of criminal/conspiratorial conduct by Moran: acceptance of fees paid on several occasions by Miguel Rodriguez–Orejuela through Ackerman and Lopez for representation of organization members, reports that Moran told CS–5 to flee the United States in advance of being indicted, and Moran's offer to represent Lopez for "free." Each of these specific allegations supported the Magistrate Judge's conclusion that Moran had engaged in similar activities and that evidence of such conduct might be discovered at Moran's office and storage facility. Moran was also reported attending a meeting at the home of Miguel Rodriguez–Orejuela in Cali during the pendency of the Ackerman case, No. 92–0262–CR–GRAHAM, and the affidavit states that contact was made between Moran's office and telephone and facsimile numbers connected with Miguel Rodriguez–Orejuela in Cali on numerous occasions. Statements by Ackerman and attorney Rosenthal support the allegation that Moran served as a Miami-based coordinator of legal representation for members of the organization. The proffered evidence demonstrated allegations of a sufficiently widespread effort by both Abbell and Moran to obstruct justice such that I cannot conclude that the warrant was overbroad. *United States v. Sawyer,* 799 F.2d 1494 (11th Cir.1986).

■ The affidavit includes a sufficiently narrow description, based on the nature and extent of the activities under investigation, to direct the agents in their search for responsive documents. *Wuagneux,* 683 F.2d 1343. As to Defendants' arguments regarding seizures of documents containing names which were not specifically identified in Attachment F, the procedure in place—whereby the Special Master and this Court are reviewing the fruits of the searches on a document by document basis—will reveal the responsiveness of particular documents. The seizure of a document which contains only non-responsive names may still be considered within the scope of the warrant if, looking at the totality of the circumstances, the document is closely related to the basis for probable cause. A document which is implicitly within the scope of the warrant—even if it is not specifically identified—may in some cases be found to have been seized in good faith, and therefore the seizure may be valid. *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).[29]

While it is true that the items described relate to Defendant's professional activities and do not necessarily contain independently ascertainable evidence of criminal conduct, this fact does not preclude them from also being evidence—taken in context—of criminal activities. The Court finds that the seized items were described with sufficient particularity to satisfy the Fourth Amendment. The 11th Circuit has stated, "[t]h[e] requirement of particularity prevents 'general exploratory rummaging in a person's belongings,' . . . but elaborate specificity is unnecessary. The description is considered 'sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized.' " *United States v. Betancourt,* 734 F.2d 750, 754–55 (11th Cir.1984) (citations omitted).

## III. EXECUTION OF THE WARRANTS

■ The allegations in this case fall squarely within those categories of allegations which courts have noted involve the piecing together of a "puzzle", i.e. a number of items of evidence that may not appear incriminating in a vacuum but may have an interlocking character that constitutes evidence of a crime. "[G]iven the complexity of the crimes under investigation and the fact that they would be detected primarily if not exclusively through analysis and synthesis of a large number of documents, a rather exten-

---

**28.** During intercepted telephone conversations between Laguna and Rodriguez–Orejuela's secretary, Laguna discussed an August 4, 1994, trip with "Dr. Abbell" to Cali.

**29.** As I have found that probable cause existed to support the warrant, it is unnecessary to address Defendants' arguments against application of the "good faith" exception.

sive search could reasonably be expected." *Wuagneux,* 683 F.2d at 1352. Warrants authorized on the basis of these types of allegations necessitate an appropriately flexible analysis when determining the reasonableness of their execution. *See, e.g., Andresen v. Maryland,* 427 U.S. 463, 481 n. 10, 96 S.Ct. 2737, 2749 n. 10, 49 L.Ed.2d 627 (1976); *United States v. Norton,* 867 F.2d 1354, 1360 (11th Cir.1989). As noted by the court in *Sawyer,* "[t]he magnitude of the search ... is not sufficient to establish a constitutional violation." 799 F.2d at 1509 (citing *Wuagneux,* 683 F.2d at 1352). Remedies under these circumstances are generally suppression and return of any non-responsive documents caught in the web of seizure, rather than invalidation of the entire search. *Andresen v. Maryland,* 427 U.S. at 482 n. 11, 96 S.Ct. at 2749 n. 11; *National City Trading Corp. v. United States,* 635 F.2d 1020, 1026 (2d Cir.1980).

■■■■■ An agent's review of materials during a search must be guided by his or her familiarity with the warrant and its supporting statement of probable cause. Although no testimony has been provided to the Court regarding the searching agents' familiarity with Agent Kacerosky's affidavit (the Court notes that Agent Kacerosky was prohibited from participation in the actual searches), which remained under seal at the time of execution of the warrants, the Government did provide briefings to the searching agents prior to execution of the warrants. At a hearing before this Court on August 28, 1996, on Defendant Moran's Motion to Suppress, Moran testified that he asked for a copy of the list of names which one of the search team agents was using, but was denied. It appears from the September 8, 1994, Memorandum sent to the Taint Team by Theresa Van Vliet of the Department of Justice,[30] that

an alphabetized listing of the names and aliases included in Attachment F (which was in non-alphabetical order) was provided for the search team's assistance.[31] Thus, there is sufficient indication in the record to infer that the search teams were familiar with Attachment F. However, even if there were agents present during the search who were neither briefed nor had an opportunity to review the warrant and affidavit, this would not invalidate the search. *United States v. Heldt,* 668 F.2d 1238, 1261–62 (D.C.Cir.1981) (finding that the availability of search team leaders and the scheduled review by same before making a final determination as to seizure provided sufficient supervision and thus rendered the search reasonable despite participation of fifty late-arriving agents who were not fully briefed).

■■■■ When executing a search warrant for documents, searching agents are entitled to at least cursorily examine each document at the specified search location. The Eleventh Circuit, in *Slocum,* adopted the following standard (which was previously articulated by the Courts of Appeal for the District of Columbia and the Second Circuit): a searching officer is entitled to briefly examine any document in order to perceive its relevance to the crime charged, but such perusal must cease at the point it becomes clear that the warrant is inapplicable. 708 F.2d at 604.

■■■■ The agents in the present case were instructed that, upon discovery of items referenced in Attachment F to the supporting affidavit, the item should be identified to the search team leader without removing the item from the location where it was discovered. The team leader was instructed to address any legal questions regarding the seizure of items to the Department of Justice

---

**30.** *See* Government Exhibit 2, submitted at the hearing on August 28, 1996.

**31.** The Court notes with concern that the alphabetized listing contained several errors which were unexplained. On October 6, 1994, the United States reported to another judge of this District that the alphabetized version of Attachment F given to the search teams included ten names that were not on the original Attachment F (and thus were never approved by the issuing Magistrate Judges), and omitted twenty names

that were on Attachment F. *See Stipulated Chronology,* filed August 27, 1996, and Government Exhibit 13, submitted at this Court's hearing on Defendant Moran's Motion to Suppress, August 28, 1996. As the parties have stipulated that these defects were "inadvertent[]", and as it appears that the problem is remediable through the Special Master's and this Court's review of the seized documents, no further Court intervention is necessary at this time.

attorney. That attorney would also—upon completion of the search—be in custody of the materials to be seized and would review those materials prior to disclosure to the prosecution team. Affidavit, Attachment G at ¶ 7, 11. Given the nature of the crimes charged and the circumstances surrounding execution of the warrants, the Court cannot say that the Defendants' constitutional rights were violated. *Wuagneux,* 683 F.2d at 1353.

The affidavit submitted in application for the search warrant included search procedures which apparently were reviewed and approved by attorneys at the Department of Justice. In addition to the pre-search briefings and the on-premises contemporaneous review by Department of Justice attorneys, the search procedure included other specific provisions designed to minimize the intrusion into the law office workday.

According to his affidavit, Agent Kacerosky sought consultation regarding the anticipated seizure of computers at the law offices. A forensic computer expert with the United States Customs Service, John Mellon, advised affiant that because computer evidence is particularly vulnerable, e.g., to tampering or destruction through error, and due to the time required to properly retrieve all data within a system, the entire computer system and accompanying software must be seized, as well as any instruction manuals, in order to safely and accurately preserve and duplicate the computer evidence. Affidavit, ¶ 176. This procedure effectively minimized disruption of the business conducted by the law office by reducing the amount of time necessary to execute the warrant and by maintaining the file folders relatively intact. *United States v. Santarelli,* 778 F.2d 609, 615 (11th Cir.1985) (removing documents to another location for subsequent examination was reasonable in light that examination would require several days).

In addition, the assignment of a "taint team" of Government attorneys and the segregation of the prosecution team of Assistant United States Attorneys and case agents supports the determination that this search was designed to minimize the exposure of privileged information. While the concept of a "Chinese Wall" may be "chimerical" (*The Champion,* August 1996, p. 27), it is nevertheless a step toward a desirable procedure. Further, this Court did not permit the Department of Justice attorneys (i.e., the taint team) who litigated the search issue on behalf of the Government to view the documents being litigated.[32]

Although federal appellate courts have expressed concern that special care be taken when searching a law office, *In re Grand Jury Subpoenas Dated December 10, 1987,* 926 F.2d 847, 858 (9th Cir.1991) (search was a model of government sensitivity to the "special privacy interests ... implicated when a law firm's files must be searched"); *In re Impounded Case (Law Firm),* 879 F.2d 1211, 1212 (3d Cir.1989) (recognized concerns for privacy interests); *In re Impounded Case (Law Firm),* 840 F.2d 196, 199 (3d Cir.1988) ("special concern for privacy interests [where] seizure of certain documents may intrude upon confidential relationships existing between attorneys in the subject firm and the firm's clients"), this Court's review has found no authority for the proposition that separate legal rules must be applied to the review of such searches. *See, e.g., United States v. Mittelman,* 999 F.2d 440 (9th Cir.1993) (vacating general suppression order and remanding for trial court to determine what evidence was seized in violation of the warrant executed on attorney's office); *Klitzman, Klitzman & Gallagher v. Krut,* 744 F.2d 955, 959 (3d Cir.1984) (ordering all files returned and procedures to be developed to govern the search); *National City Trading Corp. v. United States,* 635 F.2d at 1026 ("a criminal enterprise does not exempt itself from a search warrant by conducting its business and keeping its records in its lawyer's office");

Although the Court has concluded that an appropriate procedure was developed and operational, it appears that there were areas in which searching agents failed to comply with their respective instructions. I cannot pass

---

**32.** Nor did the Court permit the prosecution team to view the indices summarizing the Special Master's determinations as to the documents, despite the Government's request for such access.

on this issue without expressing concern for the situation as described in the affidavit of Bruno Ristau (dated October 3, 1994, submitted with *Defendant Abbell's Motion to Suppress* )—the factual content of which is undisputed by the United States. Attorney Ristau was present at the Ristau & Abbell firm during the search on September 9, 1994. His request for a copy of Attachment F was denied by Special Agent William T. Parks of the U.S. Customs Service in Miami, who was identified as the team leader for the search. Attorney Ristau asked for the name of the Department of Justice attorney assigned to the search—none was present at the scene— and was told by Agent Parks that Ristau would receive the name "after [Parks] conducted the search". ¶ 13. In addition, Attorney Ristau was not permitted to be present when *the* inventory was taken. ¶ 27.

The Court notes with special disapproval that one agent involved in the search of the Ristau & Abbell office—whose name is not provided in Ristau's affidavit—made comments in the presence of one attorney of the firm which were perceived as sexually discriminatory. In response to complaints that the searching agents entered each office and searched each desk at the firm the United States claims that the agents "could not be expected to understand the organization of the firm and division of labor among the attorneys and paralegals." *Response to Defendant Abbell's Motion to Suppress Fruits of Search,* filed December 10, 1996, at p. 3. While this claimed ignorance on the part of the agents may be understandable, no excuse exists for discriminatory remarks/ conduct on the part of public servants if, in fact, such remarks were made. However, these charges do not affect the nature and validity of the search.

Additionally, neither Moran (nor his associate, Lawrence Kerr) nor Abbell (nor his partner, Bruno Ristau) were permitted to review attachment "F" during the execution of the warrant. The letter provided to the attorney whose office was being searched,

entitled "To Whom it May Concern" from Department of Justice Attorney Van Vliet,[33] was sufficiently vague as to create a specter of intrusion which was emphasized by the comportment of the agents on the premises. Despite specific instructions from the Department of Justice, *see* September 9, 1994, Memorandum from Attorney Van Vliet, searching agents apparently failed to record the time at which specific items were seized. The United States explains the absence of the Department of Justice attorney at the Ristau & Abbell search on the basis of the designated attorney's advanced state of pregnancy. As this search was conducted in Washington, D.C., the location of the Department of Justice main office, this explanation is unacceptable—surely another attorney was available to attend the search.

In sum, although the Government's conduct bordered on the objectionable, I cannot say that the problems in the execution of the search were of a constitutional dimension.

■ Although Abbell[34] has listed several allegedly non-responsive items[35]—which the Government argues were, for the most part, responsive—the seizure of items outside the warrant, standing alone, is insufficient to render the search unconstitutional. It is "inevitable that some irrelevant materials would be seized as agents searched through numerous documents for evidence". *United States v. Schandl,* 947 F.2d 462, 465 (11th Cir.1991). The magnitude of a search is not enough by itself to establish a constitutional violation. *Heldt,* 668 F.2d at 1254 (determining that extensive searches of premises of Church of Scientology and seizures of thousands of documents were reasonable). A reviewing court may properly consider the conditions under which the agents conducted the search, and the particular nature of the evidence being sought in relation to the underlying offenses. *Id.*

This court has recognized that although the crimes of conspiracy and obstruction of justice may present law enforcement offi-

---

**33.** *See* Government Exhibit 3, submitted at the hearing on August 28, 1996.

**34.** Defendant Moran has submitted a similar argument.

**35.** This list is found in Attachment A to the Affidavit of Bruno Ristau, submitted with *Defendant Abbell's Motion to Suppress,* filed October 21, 1996.

cers with difficult evidence-gathering problems, such difficulties do not prevent the use of comprehensive search warrants designed to obtain all relevant documentary evidence. "[C]onspiratorial crimes are conducted with more secrecy than many other crimes, and search warrants that seek evidence of conspiracy, and otherwise meet the required standards, may extend to all relevant evidence of that crime." *Id. (quoting In re Search Warrant Dated July 4, 1977,* 572 F.2d 321, 328 n. 4 (D.C.Cir. 1977)).

 The Court has reviewed the list and finds that it contains mostly items which are responsive to the warrant and, thus, were properly seized. For example, item 6 is described as several volumes of Giron Trial Transcripts. Carlos Giron is listed on Attachment F at number 79. The searching agents properly seized these transcripts—regardless of whether they are public documents. Defendant Abbell complains that computer disks were seized (described as items 2, 13—17, 32) despite the fact that they bore labels lacking a responsive name. As correctly noted by the Government in its response, the agents were not required to accept these labels as indicative of the disks' contents. *Slocum,* 708 F.2d at 603. Moreover, the computer materials identified as items 1 (backup tapes), 9 (software upgrades and manuals), and 10 (hardware, keyboards, etc.) were properly within the scope of the warrant. While there are some items on the list which raise a question of responsiveness, e.g. item 18 (materials regarding research into health insurance policies for firm employees), item 24 (fax to Office Manager's doctor regarding her personal medical files), the proper remedy under the totality of the circumstances is the immediate return of such items and not the suppression of the entire universe of materials seized. "Courts have consistently held ... that absent a 'flagrant' disregard of the terms of the warrant, the seizure of items outside the scope of a warrant will not affect admissibility of items properly seized." *Wuagneux,* 683 F.2d at 1352.

In summary, if what Mr. Ristau alleges is true, it would appear that the search was not conducted with the sensitivity referred to in *In re Grand Jury Subpoenas,* 926 F.2d at 858. However, I am similarly unable to conclude that this search violated fourth amendment law. As I am satisfied that the procedure in place sufficiently protects the attorney-client and work product privileges which have been or could be asserted, it is my conclusion that the execution of the search warrants as to the law office of Ristau & Abbell, the law office of Moran & Gold, and the storage facility of Moran & Gold was not unreasonable.

## IV. SECOND SEARCH WARRANT

 Approximately two years after the search of Defendant Moran's (the only Defendant as to whom the second search warrant was directed) law office and storage facility, the United States sought an additional warrant to search for items pertaining to seven individuals. According to the affidavit of Agent Kacerosky submitted in application for the second search warrant, two of the seven individuals had been identified by other names in the first affidavit. Defendant argues that the Government should be prohibited from attempting to validate (through the issuance of a new search warrant) the seizure of materials which were not responsive to the first search warrant.

Defendant Moran also argues that the second search warrant is lacking in probable cause and fails to satisfy the particularity requirement. Defendant's argument highlights the curious feature of Agent Kacerosky's affidavit submitted in support of the second search warrant: how did Agent Kacerosky know that the items had been "previously seized"? Second Affidavit, pp. 3–4, 23–24. Agent Kacerosky was not present at the first search, nor had he, as a member of the taint team, an opportunity to review the documents prior to preparing the affidavit for the second search warrant. As Defendant Moran argues, it is possible that—but for the initial overbroad search/seizure—the documents would not have been locate-able since Moran's office has since closed.

It is axiomatic that probable cause must exist at the time a magistrate judge issues a search warrant. *Sgro v. United States,* 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932); *Bascaro,* 742 F.2d at 1345. The following

observations are relevant to this Court's review of probable cause supporting the second search warrant, but would, of course, be irrelevant regarding the initial search warrant. Defendants Abbell and Moran, both of whom are attorneys, were charged in a Third Superseding Indictment, returned by the grand jury on June 2,1995.[36] The charges against these Defendants include conspiracy to engage in racketeering (Count I), substantive racketeering acts (Count II), conspiracy to import and distribute cocaine (Counts III and IV), and conspiracy to launder money (Count IX). The Magistrate Judge was undoubtedly aware of the pending charges at the time he authorized the search warrant. In addition to the pending charges, the affidavit asserted that criminal defense attorneys Laguna, Rosenthal, Moore, and Ferguson had entered pleas of guilty to charges similar to those faced by Abbell and Moran. Second Affidavit, ¶ 9. The affidavit stated that "a number of other new witnesses, in addition to [the attorneys above identified], have been developed relative to Moran." Second Affidavit, ¶ 12. The indictment of Moran and the information in the affidavit provided the Magistrate Judge with sufficient probable cause to believe that a crime had been committed by Moran.

The Second Affidavit is also sufficiently particular to satisfy the Fourth Amendment. The Second Affidavit corrects the identification of Herb Alberto Ortiz, ¶¶ 13 –19, previously identified as Miguel Sossner, at # 24, Attachment F; and Jorge Solano, ¶¶ 20–28, previously identified as John Doe, a/k/a Eugenio Arocho, at # 20 on Attachment F to the first Affidavit. In addition, the Second Affidavit lists five additional names involved in the organization—each of which has an alleged connection with Moran. The search is narrowly tailored to the universe of "previously seized" items and does not involve any further infringement of Moran's interests—since the items had already been reviewed by the Special Master. In any event, even if the initial search had been invalidated, it does not follow that the items would be immune from a subsequent search and seizure. Judge Posner has held that

items seen by an officer during an initial, subsequently invalidated search, may be lawfully seized pursuant to a later, valid warrant based on *independently obtained* probable cause. *United States v. Salgado,* 807 F.2d 603 (7th Cir.1986).

The Second Affidavit provides a sufficiently particularized basis for issuance of the second search warrant. The Magistrate Judge's determination that probable cause existed will not be disturbed. As the execution of the warrant took place while the items were either in the possession of the Government, or with the Special Master during his review, Defendant Moran has not shown any reason for suppression of the seized items because of a flawed execution. Thus, the Court finds that the search and seizure were appropriate.

## CONCLUSION

As the Court has concluded that the warrants which issued were based on probable cause, and that the manner of execution of the warrants was not unconstitutional, it is hereby

ORDERED AND ADJUDGED that Defendants' Motions to Suppress be DENIED.

---

**36.** This matter is proceeding to trial on a Fourth Superseding Indictment, which was issued on

June 20, 1996.